**PHOENIX MUTUAL LIFE INSURANCE COMPANY,**
**Plaintiff,**

v.

**SHADY GROVE PLAZA LIMITED PARTNERSHIP et al., Defendants.**

**Civ. No. H–89–963.**

United States District Court,
D. Maryland.

April 9, 1990.

Nell B. Strachan, Michael Schatzow and Venable, Baetjer and Howard, Baltimore, Md., for plaintiff.

Robert X. Perry, Jr., J. Carter McKaig and Wilkes, Artis, Hedrick & Lane, Washington, D.C., for defendants.

ALEXANDER HARVEY, II, Chief Judge.

Presently pending before the Court in this consolidated civil action is defendants' motion for summary judgment. The plaintiff is Phoenix Mutual Life Insurance Company (hereinafter "Phoenix Mutual"), a Connecticut life insurance company. Phoenix Mutual has here sued Shady Grove Plaza Limited Partnership (hereinafter "Shady Grove"), a Maryland limited partnership, and its partners or principals. The parties had entered into negotiations relating to the creation of a joint venture for the construction of an office building in Montgomery County, Maryland. When these negotiations failed to result in the execution of a formal agreement, plaintiff filed this suit claiming, *inter alia*, that a contract between the parties had nonetheless been formed.[1] Diversity jurisdiction exists.

---

1. This case has been consolidated with Civil No. H–89–1076, which was brought by Shady Grove

In its original complaint, plaintiff alleged, *inter alia*, that the parties had during the negotiations entered into certain agreements which had resulted in the formation of a partnership. Before discovery had been completed, defendants filed a motion for judgment on the pleadings pursuant to Rule 12(c), Fed.R.Civ.P., claiming that the parties' negotiations had been expressly non-binding and that, in the absence of a written agreement, no contract, joint venture or partnership was ever formed. Thereafter, leave was granted to plaintiff to file an amended complaint, and the parties subsequently agreed that the Court should not rule on the motion for judgment on the pleadings until discovery was completed.

Following the completion of discovery, defendants filed a motion for summary judgment, relying on memoranda and exhibits filed earlier in support of their motion for judgment on the pleadings. Plaintiff filed a memorandum, transcripts of depositions and exhibits in opposition to the motion for summary judgment, and defendants then replied to the opposition. Oral argument has been heard in open Court. For the following reasons, defendants' motion for summary judgment will be granted.

I

*Facts*

Plaintiff is a major life insurance company with its principal place of business in Hartford, Connecticut. Defendants are a Maryland limited partnership and its partners or principals. In February, 1987, defendants purchased a 7.95 acre parcel of real estate located at the intersection of I-270 and Shady Grove Road in Rockville, Montgomery County, Maryland. The dispute in this case results from efforts undertaken by defendants to secure financing for the construction of a 187,000 square foot office building on the property.

Prior to the purchase of the property, defendants had approached Citicorp Real Estate, Inc., N.A. (hereinafter "Citicorp") and had secured a loan commitment from Citicorp of $23,400,000 for the purchase of the land and the necessary construction. Citicorp had allowed defendants to draw $7,625,000 of this loan for the purchase of the land in February, 1987, but had declined to release further funds until defendants had obtained an equity partner which would contribute capital to the project.

In late 1986, defendants began to look for a partner to participate in ownership of the land and office building. To that end, defendants contacted L.J. Melody Company (hereinafter "Melody"), a mortgage broker in Houston, Texas. After having been approached by Melody, plaintiff proposed a joint venture in which plaintiff would fund one-half of the construction project and would then become a fifty percent general partner with defendants. Specifically, plaintiff offered to purchase from Citicorp an $11.5 million Certificate of Deposit (hereinafter "CD"), having a maturity of one year. Following completion of construction, plaintiff was to contribute the $11.5 million to the partnership and receive a one-half equity interest in the property and the office building.

Preliminary negotiations between the parties pertained to the signing of a letter of intent. Plaintiff initially sent defendants a proposed draft of the letter of intent, but the original draft was revised twice before the final version was signed by the parties in January, 1988. The final letter of intent actually consists of three letters from Phoenix Mutual to Shady Grove: a letter dated June 12, 1987 and two letters revising that draft, dated October 28, 1987 and January 8, 1988. Each subsequent letter incorporated by reference the language of the prior draft and then either added or deleted specific terms. Defendants accepted the final version of the letter of intent on January 26, 1988.[2]

---

against Phoenix Mutual and which sought a declaratory judgment to the effect that no contract existed between the parties entitling Phoenix Mutual to any interest in the joint venture or the real property owned by it.

**2.** The three letters, as combined and revised, are referred to herein as "the letter of intent."

Although the parties altered the document substantially in the course of these negotiations, a key provision of the June 12, 1987 letter remained unaltered and was thus incorporated in the final letter of intent. This provision, which is of the utmost significance in this litigation, is as follows:

If you are willing to proceed in good faith to attempt to negotiate a mutually acceptable partnership agreement, please indicate such willingness by signing the acceptance block set forth below. Execution of this letter shall not obligate [Shady Grove] or Phoenix to accept any particular terms for such partnership agreement beyond those provided for herein, it being understood that such partnership agreement must be mutually satisfactory to the parties hereto prior to execution of the same, and neither [Shady Grove] or Phoenix shall have any obligation to the others beyond the obligation on the part of [Shady Grove] to pay the costs and legal fees referred to in the preceding paragraph if a mutually acceptable partnership is not executed.

The letter of intent further provided that the parties would undertake to structure the Shady Grove agreement in a manner similar to another joint venture in which they had participated. That other project involved the Antioch Plaza in Merriam, Kansas, which had resulted in a signed partnership agreement between plaintiff and defendants. The parties had spent some time negotiating specific provisions of the Antioch agreement and sought to save time during the Shady Grove negotiations by adopting some of the same provisions. However, the Shady Grove letter of intent specifically adopted only two provisions of the Antioch agreement and stated that the remaining provisions would be "negotiated."

After the final letter of intent was signed on January 26, 1988, defendants sent Citicorp a copy of the document and requested that the remainder of the construction loan be released for defendants' use. Citicorp agreed to do so, and defendants were then able to draw funds from the loan for the construction work. Citicorp, having been provided with a copy of the letter of intent, was fully aware of the non-binding nature of the negotiations between the parties.

Although negotiations between the parties continued after the signing of the letter of intent, various disagreements thereafter arose concerning the terms of the final agreement. Plaintiff Phoenix Mutual was unwilling to commit $11.5 million of its funds at the outset of the project and requested that defendants allow it to simply reserve the funds internally rather than purchase the CD. Defendants accepted this new term only after plaintiff agreed to a revision of the budgetary figures which would reflect the loss of interest that the CD would have earned.

More serious disagreements arose as to cost overruns in the construction budget. Under the letter of intent, defendants were to bear the cost of any such overruns, but defendants indicated that they would not enter into the proposed agreement unless plaintiff would bear some of these costs. In spite of extended discussions and hard bargaining, neither party was willing to compromise on the cost overrun issue. After a final unsuccessful attempt to resolve the issue in October, 1988, the parties broke off negotiations completely. No partnership agreement was ever executed by the parties.

## II

### Summary Judgment Principles

One of the purposes of Rule 56 is to require a plaintiff, in advance of trial and after a motion for summary judgment has been filed and supported, to come forward with some minimal facts to show that a defendant may be liable under the claims alleged. *See* Rule 56(e). Moreover, " '[a] mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely.' " *Barwick v. Celotex Corp.*, 736 F.2d 946, 958–59 (4th Cir.1984) (quoting *Seago v. North Carolina Theatres, Inc.*, 42 F.R.D. 627, 640 (E.D.N.C.1966), *aff'd*, 388 F.2d 987 (4th Cir. 1967)). In the absence of such a minimal showing, a defendant should not be re-

quired to undergo the considerable expense of preparing for and participating in a trial. As Judge Winter said in *Bland v. Norfolk and Southern Railroad Company*, 406 F.2d 863, 866 (4th Cir.1969):

> While a day in court may be a constitutional necessity when there are disputed questions of fact, the function of a motion for summary judgment is to smoke out if there is any case, *i.e.*, any genuine dispute as to any material fact, and, if there is no case, to conserve judicial time and energy by avoiding an unnecessary trial and by providing a speedy and efficient summary disposition.

In two cases decided in 1986, the Supreme Court clarified and expanded the principles applicable to a trial court's consideration of a summary judgment motion filed under Rule 56. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In *Anderson*, the Supreme Court held that the standard for granting a summary judgment motion under Rule 56 is the same as that for granting a directed verdict under Rule 50, F.R.Civ.P. 477 U.S. at 250–51, 106 S.Ct. at 2511. The Court explained this standard as follows:

> [T]he judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. *The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient;* there must be evidence on which the jury could reasonably find for the plaintiff.

*Id.* at 252, 106 S.Ct. at 2512 (emphasis added).

In *Catrett*, the Court held that there is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." 477 U.S. at 323, 106 S.Ct. at 2553 (emphasis in original). In reaching this result, the Court observed:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule.Civ.P. 1; see Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 467 (1984).... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Id.* at 327, 106 S.Ct. at 2555.

In *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126 (4th Cir.1987), the Fourth Circuit discussed the Supreme Court's holdings in *Anderson* and *Catrett*. Judge Wilkinson emphasized in *Felty* that trial judges have "an affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Id.* at 1128 (quoting *Celotex, supra*, 477 U.S. at 323–24, 106 S.Ct. at 2552–53).

Applying these principles to the facts of record here, this Court concludes that defendants' motion for summary judgment must be granted. Since the facts of record here "taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue for trial. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## III

### The Claims

In its amended complaint, plaintiff has asserted 9 different claims against defendants. Four claims (Counts I, IV, V and VII) are based on plaintiff's contention that a binding agreement was reached by the parties and that defendants breached that agreement. Count I seeks a declaratory

judgment that an agreement was reached and that Phoenix Mutual is a partner in a joint venture owning the real estate. Count IV seeks an accounting, and Count V asks the Court to order defendants to execute a formal partnership agreement. Count VII asks for a judicial sale of the property. Count VIII alleges that defendants breached their duty to negotiate in good faith. Counts III and IX are based on theories of estoppel. In Count II, plaintiff seeks a recovery based on allegations of breach of fiduciary duty, and Count VI alleges misrepresentation and negligence.

The amended complaint thus contains a veritable laundry list of legal theories whereby plaintiff seeks to impose liability on defendants because of the failure of the parties to reach agreement during their negotiations. Voluminous discovery has been undertaken, and a massive record has been presented to the Court. But try as it might, plaintiff has not been able to fit the facts of record into any viable theory which would permit any recovery against defendants. Exhaustive development of the facts has done no more than establish that the parties, after extended negotiations, were unable to agree on final terms acceptable to both sides. Since no contract resulted, no partnership or joint venture was formed, and there can be no breach. Moreover, plaintiff sustained no losses because of any tortious conduct on the part of defendants.

Naturally disappointed that the lengthy negotiations went for naught and that no partnership agreement was ever consummated, plaintiff in this litigation has sought to create a contract where none existed and has struggled to come up with some theory whereby defendants might be adjudged guilty of some type of wrongful conduct. Counsel for plaintiff argues that the crux of this case is an issue of fundamental fairness. If that is the standard to be applied, plaintiff assuredly is not entitled to proceed to trial. It was hardly unfair under the circumstances here for defendants to discontinue negotiations and decline to enter into a partnership agreement with plaintiff. The parties had agreed in writing that there would be no deal at all unless a mutually acceptable partnership agreement was executed. When plaintiff refused to accept terms of the agreement proposed by defendants, no mutually acceptable contract was possible. Defendants acted fairly and reasonably when they decided that their economic interests would best be served by terminating the discussions. Defendants did not, as plaintiff has argued, go too far down the road to call off the deal with impunity, since defendants had the right to call off the deal at any time before a formal agreement was executed.

On the very full record here, this Court concludes as a matter of law that no agreement was ever reached between the parties and that none of the wrongs alleged were committed by defendants. Defendants' motion for summary judgment will therefore be granted as to all Counts.[3]

## IV

### *No Agreement Was Reached*

■ At various times during this litigation, counsel for plaintiff has argued alternatively that the type of agreement reached by the parties was either an implied-in-fact contract or an express contract. At oral argument, it was clarified that plaintiff is contending that the type of contract formed and breached was an express contract. According to plaintiff, there are three elements to this express contract: (1) the agreed terms of the letter of intent, (2) the agreement to use the Antioch project as a model, and (3) the fact that Citicorp allowed defendants to draw upon the remainder of the construction loan. Following consideration of each of these elements, this Court concludes as a matter of law that no agreement was ever reached between the parties. Evidence does not exist to indicate that the parties intended to bind themselves to an enforceable contract.

Plaintiff does not dispute the fact that the letter of intent was expressly non-bind-

---

**3.** Judgment will also be entered in favor of Shady Grove in Civil No. H–89–1076.

ing and that the letter of intent itself does not represent a final or complete agreement. It was plaintiff's policy to insert language of this sort in all of its letters of intent and thereby establish the non-binding nature of the document. Indeed, when defendants requested that plaintiff amend the language to reflect at the outset a firmer commitment, plaintiff refused to do so.[4] Furthermore, the parties do not dispute the fact that after the letter of intent was signed, both sides proposed terms which were not included in the earlier negotiations. Plaintiff renegotiated to its advantage the obligation to purchase the CD, and defendants unsuccessfully attempted to renegotiate to its advantage the cost overrun provision.

■ As a matter of law, the clear intent of the parties was that no binding agreement would become effective until a comprehensive agreement had been executed. Letters of intent and negotiations ordinarily do not constitute binding contracts and will not be enforced by the courts, in part because "the financial community does not regard [a letter of intent] as a binding agreement, but rather, an expression of tentative intentions of the parties." *Dunhill Securities Corp. v. Microthermal Applications, Inc.*, 308 F.Supp. 195, 198 (S.D. N.Y.1969). The Court in *Dunhill Securities* concluded that a detailed letter of intent signed by both parties in that case did not bind the parties to a contract when the letter expressly stated that it would be non-binding. 308 F.Supp. at 197. In so holding, the Court stated that the law will respect an agreement by the parties that no legal obligation shall be created. *Id.*, citing *Williston on Contracts*, § 21 (3d ed., 1957).

On the other hand, in *Teachers Insurance and Annuity Association v. Tribune Co.*, 670 F.Supp. 491 (S.D.N.Y.1987), the Court held that a letter of intent which expressly stated that it would be binding was an enforceable contract. The *Teachers* Court outlined five factors to determine whether the facts of a case revealed an

intent by the parties to be bound. The Court considered (1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the custom of such transactions. *Teachers*, 670 F.Supp. at 499–503; *see also Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 83 (2nd Cir.1985).

Whether the *Teachers* rationale or some other standard is applied in this case, the result is the same. The language of the letter of intent remained controlling throughout the course of the extended negotiations which occurred in this case. Applying the five factors of the *Teachers* case to the facts presented here, this Court concludes that the parties did not intend to be bound until a formal written agreement was executed. The letter of intent expressly stated that the parties would not be bound until a partnership agreement had been signed. Negotiations between the parties followed a policy to which both sides adhered, namely that a preliminary letter of intent would be signed, to be followed by a fully executed partnership agreement if negotiations were successful. Many terms of the contract remained open throughout the negotiations; indeed, plaintiff demonstrated that it considered even the terms of the letter of intent to be open and non-binding when it renegotiated the CD provision, an essential element of the entire transaction. In addition, the letter of intent adopted only two of the Antioch provisions and left other terms opened and unresolved. Plaintiff has not performed or undertaken any significant duties under the proposed agreement, such as furnishing a capital contribution. Lastly, the type of contract here is one which parties would normally reduce to a writing before they would bind themselves legally.

This last factor deserves particular emphasis in this case. As the Court noted in *Kona Hawaiian Associates v. Pacific Group*, 680 F.Supp. 1438, 1454 (D.Haw. 1988), business entities ordinarily do not enter into multi-million dollar transactions

4. As testified by Doug Vikser, a representative of the broker Melody, Phoenix included the non-binding language in letters of intent of this sort to provide it "with an out."

in the absence of a comprehensive writing. *See also Millman v. Wetterau Inc.*, Civil No. H–88–1331, slip. op. at 14, 1989 WL 206582 (D.Md. June 6, 1989) (complex transactions do not become binding merely as a result of extended oral discussions). The large amounts involved and the complexity of this transaction highlight the practical business need to have the parties' legal obligations recorded in formal documents. *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262–62 (2nd Cir.1984). As the *Teachers* Court noted, there is a strong presumption against finding a binding agreement when the parties expressly contemplated the future preparation of and the execution of a formal contract document. *Teachers*, 670 F.Supp. at 499.

In this case, the plaintiff could hardly have intended to commit itself legally to a $11.5 million transaction in the absence of a comprehensive writing executed by the parties. Generally, a document is to be construed against the one drafting it, *Dunhill Securities*, 308 F.Supp. at 197, and in this case plaintiff drafted the letter of intent which included the non-binding language. Plaintiff cannot use either the letter of intent or later negotiations to avoid the express provision relieving either party of any binding legal obligation until a formal partnership agreement was signed.

Plaintiff does not, however, rely solely on the letter of intent in arguing that an express agreement was reached between the parties. Plaintiff also contends that the parties, by agreeing to follow as a model the Antioch agreement, entered into a binding contract with regard to the Shady Grove project. The undisputed material facts negate this argument. Although the parties agreed to use Antioch as a model, only two of five Antioch provisions, namely those pertaining to the tenant finish and the leasing commission monies, were eventually agreed upon. As to all the terms of the Antioch deal, the letter of intent states as follows:

> Notwithstanding any language in our letters to the contrary, we expect to proceed in good faith to negotiate mutually acceptable partnership provisions dealing with tenant finish, leasing commission monies, project cost savings, contribution loans, and an operating deficit reserve in the same manner and according to the same procedure as were agreed to in respect to the Antioch Plaza Project, Merriam, Kansas.

Clearly, the letter of intent did not adopt the complete agreement covering the Antioch deal, since certain provisions were yet to be negotiated. The parties explicitly agreed that "mutually acceptable partnership provisions" would be thereafter negotiated. The Shady Grove project contained new and different provisions, such as the financing terms whereby plaintiff would have purchased the CD. Moreover, the Antioch deal was intended to and did become final only when a definitive agreement was executed. Plaintiff thus cannot succeed in demonstrating that an express agreement was reached in this case based on the Antioch project as a model.

Plaintiff also places heavy reliance on the fact that Citicorp released construction funds even though a definitive partnership agreement had not been executed. But the fact that Citicorp decided to release these funds hardly goes to prove that a contract existed between plaintiff and defendants. The decision was one for Citicorp to make and did not create any binding contractual relationship between these parties. Although Citicorp had initially indicated that it would not release funds for construction until defendants had an equity partner, it was well aware not only of the terms of the letter of intent but also of the status of the negotiations between the parties. For business reasons of its own, Citicorp decided to make the funds in question available to defendants even though no partnership agreement had been executed.[5] This decision did not confer contractual rights on plaintiff.

In sum, plaintiff would have this Court conclude that the negotiating events themselves resulted in a binding contract. How-

---

**5.** Even if Citicorp mistakenly believed that a final agreement had been reached, such would not create an enforceable contract where, as here, none had been reached.

ever, the act of negotiating cannot create the rights and obligations which are the subject of the negotiations. Explicit written evidence of the parties' intentions not to be bound negates the existence of any obligations undertaken as a part of the proposed partnership agreement. A party can hardly be bound to reach the intended goal of negotiations simply by the act of negotiating. Indeed, continual redrafting of a document indicates the importance of the terms being negotiated and the parties' intention not to be bound until final execution of the written agreement. *Knight v. Sharif,* 875 F.2d 516, 524 (5th Cir.1989). Parties engage in negotiations not because they intend that the process itself will constitute the agreement, but because they desire and intend an eventual writing that will set forth the final terms satisfactory to both sides in every respect. *Winston v. Mediafare Entertainment Corp.,* 777 F.2d 78, 83 (2nd Cir.1985).

In this case, the parties could not agree on all the terms, and no final writing was ever executed. As a matter of law, this Court finds and concludes that the parties never throughout the course of their negotiations reached an agreement. Accordingly, summary judgment in favor of defendants will be granted as to the claims asserted by plaintiff in Counts I, IV, V and VII of the amended complaint.

## V

### Duty to Negotiate in Good Faith

■ Plaintiff also contends that defendants had a duty to negotiate in good faith which they breached in terminating negotiations once the cost overrun issue could not be resolved. This claim is without merit because evidence of bad faith on the part of defendants does not exist.

Some courts have found that a letter of intent can bind the parties to an agreement to negotiate in good faith. *Channel Home Centers v. Grossman,* 795 F.2d 291 (3rd Cir.1986); *Teachers Insurance and Annuity Ass'n v. Tribune Co.,* 670 F.Supp. 491 (S.D.N.Y.1987). In *Channel Home Centers,* for example, the parties had signed a letter of intent which provided that the lessor would "withdraw the store from the rental market and only negotiate the above-described leasing transaction to completion." *Channel,* 795 F.2d at 300. The lessor thereafter found some one willing to pay a higher rent and terminated negotiations with the plaintiff. The plaintiff brought suit alleging a breach of the duty to negotiate in good faith. The Third Circuit reversed the District Court's order granting summary judgment for defendant, rejecting defendant's argument that a duty to negotiate in good faith was enforceable only if the underlying agreement had been reached. The court held the document "enforceable as a mutually binding obligation to *negotiate in good faith."* *Id.* (emphasis in original). In so holding, however, the Third Circuit specifically found that the parties had intended to be bound by the letter of intent and that valid consideration for the obligation to negotiate in good faith had been given. Defendant had promised in the letter of intent to withdraw the store from the market but had failed to do so. *Id.* at 299–300. Accordingly, the Third Circuit concluded that there existed a binding obligation to negotiate in good faith independent of the underlying transaction.

In *Teachers Insurance and Annuity Ass'n v. Tribune Co., supra,* the parties to a sale of property had signed a commitment letter which expressly stated that the letter constituted a binding agreement. The Court found that the signed letter was an enforceable agreement which bound each party to perform its obligations with reference to the sale of the property. The Court in *Teachers* identified two types of preliminary contracts that have binding force. 670 F.Supp. at 498. The first type occurs when the parties have reached complete agreement as to the transaction, and the written document merely reflects the informal agreement. A second type of binding agreement occurs when the parties "bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement." *Id.*

Quite clearly, the facts present here are quite different from those of the *Channel Home Centers* and *Teachers* cases. In *Channel Home Centers*, the defendant had breached a promise included in the letter of intent. In *Teachers*, the signed letter of intent constituted an enforceable agreement whereby the parties were bound to perform. In this case, there has been no breach of any promise contained in the letter of intent, and concededly the letter of intent is not a final agreement to perform.

Much more pertinent to the facts of this case is a recent decision of the Seventh Circuit involving a non-binding letter of intent similar to the one at issue here. In *A/S Apothekernes Laboratorium v. I.M.C. Chemical*, 873 F.2d 155 (7th Cir. 1989), the Court affirmed the District Court's ruling, which had granted summary judgment in favor of the defendant. The parties had signed a letter of intent providing for the sale of corporate assets, and the letter stated that "[a]ll of the above [language] is subject to our concluding an Agreement of Sale." *Apothekernes*, 873 F.2d at 156. When negotiations subsequently fell through, plaintiff brought suit to enforce the terms of the letter of intent.

The Seventh Circuit stated that although a duty of good faith can arise from a preliminary agreement such as a letter of intent, the scope of this duty is to be determined only from the terms of the letter of intent itself. *Id.* at 158. The *Apothekernes* Court stressed that a duty to negotiate in good faith does not encompass an automatic duty to approve the final deal. In analyzing a business deal of the sort present in this case, the Court said the following:

> In a business transaction both sides presumably try to get the best of the deal. That is the essence of bargaining and the free market. And in the context of this case, no legal rule bounds the run of business interest. So one cannot characterize self-interest as bad faith. No particular demand in negotiations could be termed dishonest, even if it seemed outrageous to the other party. The proper recourse is to walk away from the bargaining table, not to sue for "bad faith" in negotiations.

*Apothekernes*, 873 F.2d at 159, quoting *Feldman v. Allegheny International, Inc.*, 850 F.2d 1217, 1223 (7th Cir.1988).

Plaintiff contends that defendants breached a duty to negotiate in good faith by reason of the following actions: (1) by failing to communicate any "distress" about retrading the CD issue, (2) by concluding that plaintiff was trying to "slow play" the deal, (3) by failing to communicate promptly and candidly about the amount of and reasons for second cost overruns, (4) by planning to abandon the partnership if plaintiff did not bear some of the cost overruns, and (5) by failing to negotiate at the final meeting in Hartford in October, 1988.

However, these facts fail to constitute proof of any breach by defendants of a duty to negotiate in good faith. Each side was engaged throughout in hard bargaining, designed to serve its own financial interests. Each side knew that if it did not accept the terms demanded by the other, no business relationship would result. In characterizing defendants' conduct as bad faith because defendants sought to retrade the cost overrun issue to its advantage, plaintiff misunderstands the scope of the duty of good faith. That duty does not prohibit a party from bargaining to its own economic advantage; indeed, negotiations would not even be necessary if each party were not attempting to secure favorable provisions as a part of the final agreement.

Plaintiff has contended that defendants wrongfully failed to negotiate at the final meeting held in October of 1983. However, according to Doug Vikser, a representative of the broker Melody who was present at that meeting, "neither of them was willing to budge an inch in their position." Refusing to budge is hardly an indication of a lack of good faith. Since defendants' efforts to negotiate an economically favorable deal cannot on this record be characterized as bad faith, summary judgment in favor of defendants is appropriate as to Count VIII.

## VI

### Estoppel

■ Counts III and IX of the amended complaint assert claims based on a theory of estoppel. To succeed under a theory of estoppel asserted under Maryland law, a promisee must show (1) that a promise was made; (2) that the promisor reasonably expected that his promise would include substantial action on the part of the promisee; (3) that the promise did induce action which proved to be costly to the promisee because the promise was not enforced; and (4) that there was such a change of position by the promisee in reliance on the promise as to make it enforceable and create a property right in the promisee. *Newmeyer v. Newmeyer*, 216 Md. 431, 436, 140 A.2d 892 (1957). The doctrine of estoppel is not, however, to be invoked unless injustice will result if the promise is not enforced. *Union Trust Co. of Md. v. Charter Medical Corp.*, 663 F.Supp. 175, 178 (D.Md.1986).

Applying these principles to the facts of record here, the Court concludes that the claims asserted by plaintiff in both Count III and Count IX must fail. In Count III, plaintiff contends that it detrimentally relied upon defendants' conduct as evidence of an agreement. As proof of this reliance, plaintiff claims that it internally reserved funds for the Shady Grove project and, in so doing, lost other business opportunities. However, plaintiff has not here specified any particular business opportunity which was lost. Moreover, the record discloses that the internally reserved funds have consistently earned interest at the market rate.

In Count IX, plaintiff alleges that defendants are estopped from denying the existence of an agreement because defendants, in order to obtain the release of funds for construction, represented to Citicorp that plaintiff was an equity partner. This argument is without merit. Plaintiff has not

here established that it relied to its detriment on any representation made by defendants to Citicorp. Plaintiff has done no more than assert that defendants' conduct led Citicorp to act. Plaintiff has not claimed and cannot establish that it acted to its detriment based on representations made by defendants to Citicorp.

Moreover, in this case there has been no showing of injustice which would permit a recovery under either Count III or Count IX. A sophisticated investor which had engaged in many negotiations of the sort involved in this case, plaintiff knew from the outset that, if no final agreement was ever reached by the parties, lost time and effort would result.[6] Parties seeking to conclude a business deal like this one obviously assume risks of this sort. *See First National Bank of Md. v. Burton, Parsons & Co., Inc.*, 57 Md.App. 437, 470, 470 A.2d 822, *cert. denied*, 300 Md. 88, 475 A.2d 1200 (1984). Under circumstances such as those present in this case, injustice does not result when the parties fail to reach agreement.

For these reasons, defendants are also entitled to summary judgment as to plaintiff's claims asserted in Counts III and IX of the amended complaint.

## VII

### Other Claims

In Counts II and VI of the amended complaint, plaintiff relies on theories of breach of fiduciary duty, misrepresentation and negligence. These claims are likewise without merit. As Judge Motz has held, courts "have not profligately permitted indiscriminate recognition of tort causes of action in every contract case." *21st Century Properties v. Carpenter Insulation*, 694 F.Supp. 148, 151 (D.Md.1988).

■ The claim asserted in Count II must fail because no fiduciary duty was owed by defendants to plaintiff. Plaintiff contends

---

**6.** At an early stage in the negotiations, the parties recognized that plaintiff might incur expenses if the negotiations were unsuccessful. In the first draft of the letter of intent dated June 12, 1987, it was provided that if the parties were unable to agree upon the form and content of

the partnership agreement, defendants would reimburse plaintiff for all costs and counsel fees with respect to the preparation of the agreement. This provision was included as a part of the final letter of intent.

that a "special relationship" existed between the parties giving rise to creation of a fiduciary duty. This contention is specious. A fiduciary relationship hardly arises when commercial parties engage in contract negotiations. No trustee-beneficiary relationship arose here, nor do the facts indicate that any other sort of special relationship existed between these two negotiating parties. *See E.F. Hutton Mortgage Corporation v. Equitable Bank, N.A.*, 678 F.Supp. 567, 581–583 (D.Md. 1988).

Paragraph 49 of Count VI of the amended complaint alleges that defendants, at times when they owed plaintiff a fiduciary duty and a duty of care, made statements and representations which plaintiff relied upon and which caused injury and damage to plaintiff. Assuming that plaintiff is asserting a claim under Maryland law for negligent misrepresentation, the following elements must be proved by the plaintiff:

(1) that the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) that the defendant intends that his statement will be acted upon by the plaintiff; (3) that the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) that the plaintiff, justifiably, takes action in reliance on the statement; and (5) that the plaintiff suffers damages proximately caused by the defendant's negligence.

*Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 337, 439 A.2d 534 (1982) (quoted in *Weisman v. Connors*, 312 Md. 428, 444, 540 A.2d 783 (1988)).

 For reasons similar to those discussed hereinabove, plaintiff's claim of negligent misrepresentation must likewise fail. Proof does not exist that representatives of defendants negligently made a false statement knowing that plaintiff would justifiably rely on the statement and thereby suffer loss and injury. In this, as in any complex business negotiation occurring over a period of months, the parties knew that until a final agreement was executed, there could be no final deal. In this particular case, there was no absolute commitment by the parties to all the terms of a comprehensive partnership agreement. Only when assent to all the terms had been secured from defendants would plaintiff reasonably have been entitled to rely on statements made by representatives of defendants. On the record here, plaintiff cannot show that it relied on the alleged misrepresentations nor that it suffered damage because of any negligent misrepresentations of defendants.

 Nor would plaintiff be entitled to any recovery in this case under a theory of negligence. The mere negligent breach of a contract, absent a duty or obligation imposed by law independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort. *Flow Industries, Inc. v. Fields Construction Co.*, 683 F.Supp. 527, 530 (D.Md.1988), quoting *Heckrotte v. Riddle*, 224 Md. 591, 595, 168 A.2d 879 (1961). In this particular case, there was no contract formed, and defendants' actions, undertaken in this commercial setting, do not constitute the breach of a standard of due care which proximately caused loss to the plaintiff. *See 21st Century Properties, supra* at 151.

Accordingly, summary judgment in favor of defendants will likewise be entered as to Counts II and VI.

## VIII

### *Conclusion*

For the reasons stated, defendants' motion for summary judgment will be granted as to all Counts of the amended complaint. Judgment will also be entered in favor of Shady Grove in Civil No. H–89–1076. An appropriate Order will be entered by the Court.