**TECART INDUSTRIES, INC. Plaintiff**

v.

**NATIONAL GRAPHICS, INC. Defendant**

**No. CIV. H–01–1537.**

United States District Court, D. Maryland.

May 15, 2002.

Peter F. Axelrad, Susan Stobbart Shapiro, Council Baradel Kosmeri and Nolan PA, Annapolis, MD, for Plaintiff.

Ronald H. Jarashow, L. Dale Burgmeier, Franch Jarashow Burgmeier and Smith PA, Annapolis, MD, for Defendant.

*MEMORANDUM OPINION*

HARVEY, Senior District Judge.

This is a civil action in which the corporate plaintiff is seeking damages and other relief from the corporate defendant for allegedly breaching a written contract between the parties. A Michigan corporation with its principal place of business in Farmington Hills, Michigan, plaintiff TecArt Industries, Inc. ("TecArt") manufactures so-called "backlit" illuminated signs.[1] A Maryland corporation with its principal place of business in Baltimore, Maryland, defendant National Graphics, Inc. ("National Graphics") manufactures, in addition to other products, different lines and sizes of plastic signs in its Backlit Sign Division.

There have been business dealings between the parties for a number of years. In February of 2001, representatives of the parties entered into negotiations for the purchase by plaintiff TecArt of the Backlit Sign Division of defendant National Graphics. These negotiations eventually led to a letter agreement between the parties dated March 29, 2001. In its complaint, TecArt characterizes the March 29, 2001 document as a binding and enforceable contract which National Graphics has breached. Defendant here asserts that the document in question is no more than a letter of intent and that since, as contemplated by the letter, no formal purchase agreement was ever executed at a later time, National Graphics is not liable to TecArt for breach of contract.

In Count I of the complaint, plaintiff requests that the Court enter a judgment specifically enforcing the alleged agreement. Count II seeks a recovery of $500,000 for breach of contract. Diversity

---

1. Backlit signs are illuminated signs sold as alternatives to signs which have frontal neon lighting.

jurisdiction exists in this case under 28 U.S.C. § 1332(a).

Pursuant to Scheduling Orders entered by the Court, the parties have engaged in discovery. After discovery had been completed, defendant National Graphics filed a motion for summary judgment. That motion was briefed by the parties, and a hearing was held in open court. In its Memorandum and Order of January 14, 2002, this Court held that genuine issues of material fact existed as to whether the document at issue was a mere letter of intent or whether the parties had intended it to be a binding and enforceable contract. The Court concluded that the disputes of fact existing in the record could be resolved only after a trial and after the Court had heard all of the relevant evidence. (Slip op. at 11).

A pretrial conference was thereafter held, and a Pretrial Order was entered by the Court on February 20, 2002. In its earlier Order of January 14, 2002 denying defendant's motion for summary judgment, the Court had directed that, pursuant to Rule 42(b), F.R.Civ.P., there would in this case be a separate trial of the liability and damages issues.

The case then came on for a bench trial on the liability issues.[2] Representatives of the principal parties testified at the trial, and numerous exhibits were admitted in evidence. The testimony of the witnesses was conflicting in many respects, and in resolving the issues of fact, due regard has been given by the Court to the credibility of the witnesses and the weight their testimony deserves. Pursuant to Rule 52(a), F.R.Civ.P., findings of fact and conclusions of law are contained in this Memorandum Opinion whether or not so characterized.

# I

## Facts

A family owned corporation, National Graphics was founded in 1949 by Earl Seth, Sr. ("Mr.Seth"), as a company marketing hand painted and screen printed signs to the grocery industry. All four of Mr. Seth's children were in time employed by the corporation, and they are all now stockholders. In 1995, Mr. Seth decided that manufacturing backlit sign cabinets might prove to be profitable. Robert Krohn ("Krohn") was hired in that year to develop the fledgling lighting division then formed. In 1996, Krohn was promoted to General Manager, and when Mr. Seth later became ill, Krohn was awarded 20% of the stock and assumed the position of Chief Operating Officer

As a result of continuing losses in the 1990s, National Graphics filed on November 10, 1998 in the United States Bankruptcy Court for the District of Maryland a voluntary petition under Chapter 11 of the Bankruptcy Code. *In re National Graphics, Inc.*, Bankruptcy No. 98–65946–JS. During the course of the bankruptcy proceedings, National Graphics continued to operate its business as a debtor-in-possession. An amended plan of reorganization was eventually confirmed by the Bankruptcy Court on September 26, 2002, and the bankruptcy case was closed by a Final Decree entered on February 6, 2001.

Plaintiff TecArt was incorporated in 1989 as a company operating primarily in the backlit sign business. Since 1998, TecArt has been purchasing some of its plastic backlit signs from National Graphics.

In 1998, representatives of TecArt made an offer to purchase the Backlit Sign Division of National Graphics. That offer was

---

**2.** Since the issues had been fully briefed at the summary judgment phase of the case, no pretrial briefs were filed by the parties.

rejected. Early discussions had related to the purchase by TecArt of an equity interest from National Graphics' shareholders. In February of 2001, negotiations between the parties resumed. Discussions were held between Krohn and H. Halstead Scudder ("Scudder"), who was Chairman and President of TecArt.

On March 7, 2001, Scudder sent separate letters to both Krohn and Earl Seth, Jr. ("Seth"),[3] enclosing for distribution to each family member a copy of a "Letter of Intent" which related to the purchase by TecArt of National Graphics "Lighting Division." The letters of transmittal enclosed a six-page document entitled "Binding Letter Agreement" which was signed by Scudder and Barry Shapiro ("Shapiro")[4] and addressed to Krohn and Seth. In that document, Scudder and Shapiro proposed on behalf of an entity to be formed to purchase a 100% "equity" interest in the "Lighting Business" of National Graphics. Nevertheless, that acquisition was to be structured as an "Asset Purchase" whereby the purchaser TecArt would acquire certain assets of National Graphics Lighting Division.

The particular terms of the proposed letter agreement of March 7, 2001 were not acceptable to Krohn and Seth. Further negotiations then ensued. On March 28, 2001, Scudder sent to Krohn and Seth revised copies of a document characterized in their letter of transmittal as a "Letter of Intent." Included was a blacklined draft which highlighted changes "made from the previous LOI". After certain additional changes were made in that document, Krohn and Seth were sent a letter dated March 29, 2001 which was styled as "this revised Binding Letter Agreement" (referred to herein as "the March 29 document"). On April 5, 2001, Krohn, Seth and the three other owners of National Graphics[5] signed the March 29, 2001 document, agreeing to its terms. In its complaint, plaintiff TecArt characterizes the March 29 document as a binding contract which has been breached by defendant National Graphics.

Pursuant to Paragraph 1 of the March 29 document, the purchase price was to be $320,000 plus royalty payments made over a period of five years. Paragraph 3 provided that $150,000 was to be paid in cash at the closing and $170,000 in the form of the assumption by TecArt of certain indebtedness owed by National Graphics as a result of its earlier acquisition of the Neat Ideas, Inc. lightbox line.

Paragraph 4 of the March 29 document stated that National Graphics would receive a 4% royalty on Tec Art's sales of all of the Lighting Division's backlit sign products, payable monthly for a period of five years. In Paragraph 5, the parties "contemplate[d]" that TecArt would enter into a Consulting Agreement with Krohn. Paragraph 6 required TecArt as the purchaser to prepare a formal Purchase Agreement, which "shall be reasonably satisfactory to the Purchaser's and Division's respective legal counsels." The parties agreed to make "a best effort" to complete the described transaction and "to do all reasonable and necessary things" to cause the contemplated transaction to proceed to close not later than May 15, 2001. Paragraph 7 contained terms for the adjustment of the purchase price. The purchase price was to be increased on a dollar

---

3. Seth is President of National Graphics.

4. Shapiro is an officer and director of TecArt. There were at the time only two members of TecArt's Board of Directors, namely Scudder and Shapiro.

5. The stock of National Graphics was owned by five shareholders, namely the four family members and Krohn.

for dollar basis to the extent that the value of the equipment and inventory being sold exceeded the book value of such items as of January 31, 2001. However, to the extent that the value of those items was less at the time of closing, the purchase price was to be decreased on a dollar for dollar basis.

Paragraph 16 provided as follows:

16. BINDING EFFECT: This Agreement contemplates the Purchaser and Seller entering into a formal Purchase Agreement containing the covenants, warranties, representations, indemnification's, [sic] and other terms and conditions contained in this Agreement and customary for this type of transaction, all of which shall be reasonably satisfactory to the Purchaser's and Seller's respective legal counsels. In spite of this requirement for a final Purchase Agreement, the parties hereto desire this clause to be interpreted in the broadest possible terms, and desire to bind themselves to complete the transaction described in this Agreement, and will do all reasonable and necessary things to cause the transaction contemplated herein to proceed to close.

On April 24, 2001, a draft of a proposed Asset Purchase Agreement was sent by Scudder to National Graphics. During April and early May there were discussions between the parties with reference to various terms and conditions to be contained in the proposed Asset Purchase Agreement. In particular, a dispute had arisen concerning the royalty payments to be made by TecArt to National Graphics for sales of the latter's backlit sign products. Proposals for resolving this dispute were discussed by the parties, and various letters and faxes were exchanged both before and after May 15, 2001.

A firm closing date of May 15, 2001 had been set by Paragraph 6 of the March 29 document because National Graphics was in immediate need of additional capital in order to be able to fulfill outstanding orders. In particular, K–Mart had ordered power poles [6] from National Graphics, and when no agreement had been reached with TecArt in mid-May, National Graphics was in a severe time pinch. An impasse was reached on May 22 when counsel for TecArt declined to provide bridge funding so that National Graphics might have cash to meet its outstanding obligations. National Graphics then abandoned attempts to reach an agreement with TecArt and commenced negotiations with Bowman Photographic ("Bowman"), a Chicago company.

On June 1, 2001, a three page written agreement was executed by National Graphics stockholders and by representatives of Bowman. Under that agreement, Bowman provided $125,000 as needed for the purchase of 35% of the outstanding stock of National Graphics. Included in the sale was certain equipment which National Graphics agreed to lease back from Bowman at specified prices.

This civil action was filed in this Court by plaintiff TecArt on May 29, 2001. Plaintiff TecArt here contends that it was ready, willing and able to perform under the terms of the March 29 document and that National Graphics breached this allegedly binding agreement by refusing to complete the sale of the assets of its Backlit Sign Division to TecArt. According to defendant National Graphics, the March 29 document executed by its representatives on April 5, 2001 is merely a letter of intent and is not an enforceable contract. National Graphics contends that since the parties were never able to agree on essential terms of the proposed Purchase

**6.** Power poles are floor-to-ceiling aluminum poles seen at checkout lanes in retail establishments. They carry power and communications down to cash registers and scanners.

Agreement, no binding contract existed for the acquisition by TecArt of the assets in question.

## II

### Applicable Principles of Law

In recent years, this Court has on several occasions had before it civil actions requiring it to determine whether documents executed by the parties were merely letters of intent or were binding agreements. In *Phoenix Mut. Life Ins. Co. v. Shady Grove Plaza Ltd. Partnership*, 734 F.Supp. 1181 (D.Md.1990), *aff'd* 937 F.2d 603 (4th Cir.1991), this Court, in granting defendant's motion for summary judgment, concluded that no binding agreement was reached by the parties because the document at issue was merely a letter of intent. *Abt Assocs., Inc. v. JHPIEGO Corp.*, 104 F.Supp.2d 523 (D.Md.2000), *aff'd* 2001 WL 523376, 9 Fed.Appx. 172 (4th Cir.2001), involved a question whether certain agreements executed by the parties amounted to a binding contract which defendant had breached. In granting summary judgment in *Abt* in favor of the defendant, the Court concluded as a matter of law that no binding and enforceable agreement was ever reached between plaintiff and defendant whereby plaintiff would be entitled to participate in a health care program. More recently, in *Paramount Brokers, Inc. v. Digital River, Inc.*, 126 F.Supp.2d 939 (D.Md.2000), a "letter of interest" was at issue. In granting summary judgment in favor of the defendant, the Court concluded that no final binding writing was ever executed by the parties and determined as a matter of law that the parties never throughout the course of their negotiations reached an agreement which required defendant to pay commissions to Paramount over a period of years.

The primary issue in *Waterfall Farm Sys., Inc. v. Craig*, 914 F.Supp. 1213 (D.Md.1995) was whether the parties intended in a letter agreement to bind themselves to an enforceable contract of lease or whether the document in question was no more than a letter of intent. *Id.* at 1221. After hearing all the evidence produced at a bench trial, this Court concluded that no binding lease agreement was ever reached between the parties. *Id.*

■ In all four of these cases, this Court cited with approval and relied upon *Teachers Ins. & Annuity Ass'n v. Tribune Co.*, 670 F.Supp. 491 (S.D.N.Y.1987). The *Teachers* court outlined five factors to be considered by a court in determining whether the facts of a case revealed an intent by the parties to be bound by a written document. These factors are as follows: (1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the custom of such transactions. *Id.* at 499–503.

■ Whether the parties negotiating a contract intended to be bound by a prior writing or whether they did not intend to bind themselves until a formal agreement was later prepared and signed by them must be determined from the facts and circumstances in each particular case. *Peoples Drug Stores v. Fenton Realty Corp.*, 191 Md. 489, 493, 62 A.2d 273 (1948). What must be determined in this case from the evidence presented at the trial is the intent of the parties, as shown by the written documentation and the parties' conduct during their negotiations. It is essential that the minds of the parties be in agreement on material terms in order for a contract to be established. *Marmott v. Maryland Lumber Co.*, 807 F.2d 1180, 1184 (4th Cir.1986), *cert. denied*, 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 700 (1987).

## III

### Discussion

■ Following due consideration of all of the evidence produced at the trial and in

particular the credibility of the witnesses, this Court finds and concludes that no binding and enforceable agreement was ever reached by the parties for the sale by defendant National Graphics of assets of its Backlit Sign Division to plaintiff TecArt. The evidence here does not indicate that the parties intended by the March 29 document to bind themselves to an enforceable contract. That document was no more than a non-binding letter of intent containing some but not all of the terms of an enforceable contract.

Based on the evidence presented at the trial, the Court finds that the parties intended that several additional documents would have to be agreed upon and executed by them before a binding and enforceable contract existed. The essential terms and conditions of those additional documents were not contained in the March 29 letter of intent but were subject to later negotiations between the parties. When no agreement was ever reached as to those terms and conditions, National Graphics was not contractually bound to sell assets of its Backlit Sign Division to TecArt.

(a)

*Language Used*

Evidence exists indicating that the parties, by way of the language used, intended the March 29 document to be a letter of intent. An earlier version of the document had been sent to both Seth and Krohn by separate letters dated March 7, 2001. Each of these two letters of transmittal indicated that the document enclosed was a "Letter of Intent for National Graphics' Lighting Division." A draft of a revised version of the document was forwarded by Scudder to Krohn and Seth by way of a letter of transmittal dated March 28, 2001. In that letter, Scudder again repeatedly referred to the enclosed document as a "Letter of Intent" or a "LOI." Use of these terms was certainly not inadvertent. The letter of transmittal of March 28 indicates at the outset that it is being sent "Re: Letter of Intent for National Graphics Lighting Division." The term "LOI" was used on three different occasions in the March 7 letters of transmittal and on four different occasions in the March 28 letter of transmittal.

Liberty Bidco and Comerica Bank had been providing financing to TecArt, and their approval of the transaction was necessary. In a letter of transmittal to these lenders dated April 27, 2001, Scudder referred to the March 29 document as "the LOI", and in his description of the deal bearing the same date Scudder stated that "TecArt has signed a Letter of Intent (see attached) with National Graphics, Inc...." [7]

Plaintiff TecArt relies heavily on the fact that the March 29 document was described therein as "this revised Binding Letter Agreement." Reliance is also placed on the provisions of Paragraph 16 indicating that the March 29 document is to have "BINDING EFFECT" and that the parties "desire to bind themselves to complete the transaction described...." But those provisions are not conclusive. When the language in question is considered together with the numerous contrary references contained in the March 7, March 28 and April 27 letters of transmittal, it is apparent that the March 29 document is ambiguous. Indeed, there are other ambiguities in that document. The very first paragraph of the letter states that TecArt proposes and intends to purchase an "equity interest" in the Backlit Sign Division of National Graphics. Paragraph 1 provides that the purchase price is being paid "for the Seller's Interest in the Division...."

---

**7.** In those documents, Scudder stated that the closing was set for mid-May and requested the lenders' timely cooperation because "timing is of the essence..."

These provisions are flatly contradicted by other language in the document indicating that only a purchase of assets is intended and not a purchase of an equity interest.[8]

■ The critical ambiguity here is that existing between the characterization of the March 29 document in the letter of transmittal as a letter of intent and the language in the document itself indicating that it was to have binding effect. It is well established that doubts in the interpretation of a contract must be resolved against the drafter. *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 711 (4th Cir.2001). In this case, TecArt was the drafter of both the letters of transmittal and the March 29 document itself. The conflicting language must therefore be construed in favor of National Graphics.

Moreover, when other provisions of the March 29 document are considered, it is apparent that further action by the parties was contemplated before final agreement would be reached as to the terms of an enforceable contract. Paragraph 2 states that the acquisition "*shall* be structured" as a purchase of assets, and Paragraph 6 states that upon execution of this document, the purchaser "*shall* prepare" a formal Purchase Agreement, containing terms "customary and appropriate for this type transaction..." (Emphasis added). Executory language of this sort contemplates that future action will be taken by the parties before a binding contract would exit. *See Waterfall*, 914 F.Supp. at 1222.

■ The Asset Purchase Agreement[9] was to be "reasonably satisfactory" to the parties' attorneys. Such language implies that further discussions would be held by the parties and hardly indicates that National Graphics agreed to the terms and conditions of a final binding contract when its stockholders signed the March 29 document. Much remained to be done. There is a strong presumption against finding a binding agreement when the parties expressly contemplated the future preparation of and the execution of a formal contract document. *Phoenix Mutual*, 734 F.Supp. at 1188; *Teachers*, 670 F.Supp. at 499.

### (b)
### *Context of the Negotiations*

The context of the negotiations between the parties discloses an intent that the March 29 document was not itself to be a binding and enforceable contract. Both before and after March 29, 2001, there were negotiations between the parties. On April 26, there were face-to-face discussions concerning the final terms of the deal between the parties when Scudder and Shapiro traveled to Baltimore and met with Krohn and Seth.

In particular, the parties were after March 29 unable to reach agreement on the royalty payments to be received by National Graphics on sales by TecArt of National Graphic's backlit sign products. Although this question was addressed in Paragraph 4 of the March 29 document, the language included there did not require TecArt to sell any products of National Graphics at all. As so construed, no royalty payments would be received by National Graphics if TecArt decided to make no such sales. Understandably, National Graphics would not agree to the inclusion in the formal Purchase Agree-

---

**8.** The parties agree that the proposed transaction related to a purchase of assets and not to the purchase of an equity interest in National Graphics.

**9.** The Asset Purchase Agreement proposed by TecArt was eighteen pages in length and contained twenty paragraphs. Seven schedules were to be attached, none of which had been completed when the deal fell apart.

ment of language like that contained in this Paragraph 4. In view of Krohn's objections, Scudder entered into discussions with him in an attempt to resolve the dispute. Scudder did not at the outside of these discussions insist (as counsel for TecArt did later) that National Graphics was bound by the royalty provisions of the March 29 document.

After March 29, the parties exchanged figures in an attempt to reach agreement as to a guaranteed monthly amount to be received by National Graphics as a royalty payment. An impasse was reached when TecArt was willing to pay only a base amount of $2,500 per month while National Graphics was demanding $4,000 per month. Another term which National Graphics deemed unreasonable and unacceptable was language proposed by TecArt for inclusion in the prospective Purchasing Agreement "that Buyer has no obligation to a) sell any of the Business' products or b) sell to any of the Business' customers."[10] When TecArt's attorney threatened suit and insisted that National Graphics was bound by Paragraph 4 of the March 29 document, discussions between the parties ended. No formal Purchase Agreement was ever executed by the parties before the prospective closing date of May 15, 2001 nor during the following week when further efforts were made by Krohn to resolve the royalty payment and other disputes. As they had a right to do, representatives of National Graphics accordingly terminated negotiations with TecArt and began discussions with Bowman.

It was Scudder's belief that Krohn was not negotiating in good faith because he was at the time of their discussions dealing with another party in violation of Para-

graph 12 of the March 29 document. This was an erroneous belief. Evidence produced at the trial establishes that Krohn did not begin discussions with Bowman or any other party until several days after the May 15 closing date when an impasse had been reached with TecArt. Krohn's earlier trip to Chicago had nothing to do with the Bowman transaction.

Although some proposed provisions of a final Purchase Agreement had been accepted by National Graphics, agreement as to all the binding terms of a final document was never reached. Continual redrafting of key documents indicates the importance of the terms being negotiated and is evidence of the parties' intention not to be bound until the execution of a final written agreement. *Waterfall,* 914 F.Supp. at 1223; *Abt,* 104 F.Supp.2d at 531. The fact that Scudder continued to negotiate the royalty payment issue is evidence that the March 29 document was not intended to be a final, binding agreement.

(c)

*Existence of Open Terms*

Moreover, it is apparent from a review of the March 29 document itself that there were significant open terms. Not only was it necessary that a formal Purchase Agreement satisfactory to the parties' counsels be later prepared, but also the March 29 document provided in Paragraph 5 for the preparation and execution of a Consulting Agreement with Krohn. Furthermore, Paragraph 19 provides that the "Seller and it shareholders shall enter into Non Compete Agreements with the Purchaser." The March 29 document nowhere states what would be the terms and conditions of the proposed Consulting Agreement[11] nor

---

10. In his memorandum to Krohn of April 30, 2001, Scudder proposed that this language be included as a part of Section 3.7 of the draft Asset Purchase Agreement.

11. The draft of the Consulting Agreement prepared by Scudder was some five pages in length and contained detailed provisions relating to the proposed relationship between Krohn and TecArt.

what would be the terms and conditions of Non Compete Agreements which were to be executed not only by National Graphics but also by its stockholders.

TecArt contends that the proposed consulting agreement was not a significant part of the deal and that it is therefore not material that the terms and conditions of such an agreement were not included in the March 29 document. Evidence of record does not support this argument. As Krohn testified, the execution of a consulting agreement was an "important part" of the deal. This testimony is corroborated by other evidence. In his description of the transaction sent to TecArt's lenders on April 27, Scudder stated that TecArt would enter into a one year consulting agreement with Bob Krohn to "facilitate" the matter and that "Bob will be invaluable to TecArt in the design and tooling for a host of new sign products." Scudder testified at his pretrial deposition that he thought that a consulting agreement with Krohn was "an essential" term of the transaction. (Dep. Tr. at 127).

Another open term existed in that there was no comprehensive description of and identification of the particular assets being sold. Not all of the assets of defendant's Backlit Sign Division were to be purchased by TecArt. Excluded were outstanding accounts receivable and "those assets necessary for the manufacture and sale of Power Poles and certain Edgelit/Cold Cathode Products..." The March 29 document nowhere describes or identifies the assets necessary for the manufacture and sale of power poles, items which were not to be included in the sale but were to be retained by National Graphics. Such a description was necessary because some of the machinery used to manufacture power poles was also used to manufacture backlit signs.

An open term also existed in that the March 29 document did not indicate how the book value of the assets being sold would be determined. Such a computation was critical since under Paragraph 7 the purchase price would be increased or decreased depending upon the extent that the value of those assets was at the time of closing more than or less than the book value of the items as of January 31, 2001. There was disagreement between the parties as to the valuation method to be used. Indeed, Scudder acknowledged that accountants might disagree as to the manner of determining the value of the assets at the time of closing.

The March 29 document specifically contemplated that terms and conditions in addition to those included therein would be contained in the formal Purchase Agreement. Paragraph 6 provided that provisions of the Purchase Agreement would "not [be] limited" to "those embodied within" the March 29 document. A lengthy list of representations and warranties was included in TecArt's draft of the Asset Purchase Agreement.

At the trial, Scudder testified that it was his understanding that an executed letter of intent in industry parlance constituted a binding and enforceable agreement. This testimony will not be credited. A letter of intent ordinarily does not constitute a binding contract because the financial community does not regard such a document as a binding agreement but rather as an expression of tentative intentions of the parties. *Phoenix Mutual*, 734 F.Supp. at 1187. At his deposition, Scudder explained that the phrase "binding letter agreement" was "our form of letter of intent." (Dep. Tr. at 34).

As Krohn testified, the March 29 document was binding in some respects but not in others. According to Krohn, Scudder confirmed his understanding in this respect. When Krohn, before the March 29 document was executed by National

Graphics' stockholders, raised with Scudder questions concerning the valuation of and the listing of the assets to be sold, Scudder told him that those matters would be "fleshed out later."

### (d)
### *Partial Performance*

Plaintiff TecArt argues that there was partial performance by National Graphics of one of the terms of the March 29 Document because National Graphics complied with the confidentiality requirement contained in Paragraph 14. However, such compliance was not a material part of any final, binding contract for the purchase by plaintiff of assets of defendant. Rather, it was no more than an agreement that, during negotiations and during "a period of review" of the drafts, the confidential nature of the contents of the documents exchanged would be protected.

National Graphics does not dispute the binding nature of the requirement in the March 29 document that the parties should protect the confidential nature of information revealed during their negotiations and during TecArt's due diligence review. However, there was no partial performance by National Graphics of material aspects of the proposed agreement.

### (e)
### *Custom of Like Transactions*

TecArt also argues that the Bowman deal later negotiated by National Graphics represents significant evidence of the custom of a transaction of this sort. Since the Bowman deal was finalized by way of a very brief written document executed by the parties, TecArt maintains that the similar March 29 document constitutes a final, binding agreement. The Court must disagree.

The Bowman deal was quite different from the transaction being negotiated by TecArt and National Graphics. The Bowman deal was hastily put together so that National Graphics would have immediate access to much needed cash. Bowman did not purchase only assets of defendant's Backlit Sign Division. Rather, Bowman purchased 35% of the National Graphics company itself. Some of the assets which were to be included in the proposed deal with TecArt were also included in the Bowman transaction. However, unlike the proposed transaction with TecArt, some assets included in Bowman's equity purchase were to be leased back to National Graphics and remain in its possession in the future.

The custom and practice which parties follow in a complex transaction of the sort involved here is to sign a preliminary letter expressing future intentions to be followed by a negotiated agreement containing additional terms. *See Phoenix Mutual, Abt* and *Paramount Brokers.* Only after the latter agreement is executed does a final and binding contract exist. Here, substantial amounts totaling some $320,000 were involved, and there was to be a continuing relationship between the parties whereby certain royalty payments would be made by TecArt to National Graphics. The complexity of a transaction of the sort involved here highlights the practical business need to have the parties' legal obligations recorded in a formal document rather than by way of a preliminary letter expressing future intentions. *Phoenix,* 734 F.Supp. at 1188; *Waterfall,* 914 F.Supp. at 1224.

### (f)
### *Conclusion*

For all the reasons stated, this Court finds and concludes that there was no binding and enforceable contract between plaintiff and defendant in existence on April 5, 2001, when the five shareholders of National Graphics signed the March 29 Document. Plaintiff is therefore not entitled to a judgment enforcing the

agreement claimed to exist nor is plaintiff entitled to a recovery of damages from defendant for breach of contract.[12] Accordingly, judgment will be entered in favor of defendant National Graphics on both counts of the complaint, with costs. An appropriate Order will be entered by the Court.

12. Relying on the language of Paragraph 17 of the March 29 document, National Graphics has also argued that it is entitled to the entry of judgment in its favor because there was in the alleged contract no mutuality of the parties' obligations. Since the Court has determined that no binding contract existed between the parties, it is not necessary to consider whether the March 29 document is not enforceable because of the absence of sufficient mutuality of obligation.