# Richmond

## T. P. Eason v. J. E. Rose, Jr.

November 20, 1944.

Record No. 2814.

Present, All the Justices.

The opinion states the case.

*Charles B. Godwin, Jr.,* for the plaintiff in error.

*Thomas L. Woodward,* for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

This is an action of unlawful detainer instituted by J. E. Rose, Jr., hereinafter called the plaintiff, against T. P. Eason, upon a summons issued by a justice of the peace on February 3rd, 1943, to recover the possession of a farm. At the hearing before the trial justice of the county of Isle of Wight, judgment was entered in favor of the defendant, T. P. Eason.

The plaintiff appealed, and the case was thereafter heard on July 3rd, 1943, in the circuit court. Neither party demanding a jury, all matters of law and fact were submitted to the court. The court being of opinion that T. P. Eason was a tenant at will rendered judgment that the plaintiff recover the possession of the land, and accordingly awarded

him a writ of possession. From this the defendant, Eason, has appealed, upon the principal grounds that the trial court erred in holding that the tenancy of T. P. Eason was at will and not from year to year, and in awarding the plaintiff all crops planted by the defendant.

The following facts and circumstances appear from the evidence:

The real property in question, a farm of 118 acres and a one-room house, in the County of Isle of Wight, Virginia, was formerly owned by S. P. Eason, the father of T. P. Eason. In 1924, at a foreclosure sale under a deed of trust, P. M. Eason purchased the property. P. M. Eason then told his brother that the latter could repurchase the farm by paying to the former the amount of money he had invested in it. Thereafter S. P. Eason "continued to look after the farm," and although a price was made to him, he never offered to buy it. Each year from 1924 to 1935, inclusive, S. P. Eason paid to his brother $160, which he thought its use was worth. In 1936 and 1937, S. P. Eason rented the farm to a colored man for $150 per year, which he paid over to P. M. Eason. Beginning with 1938, T. P. Eason began to farm the place, and each year paid to P. M. Eason $100.

P. M. Eason testified that he never had any rental agreement with anyone; that every one knew he was going to sell the farm as soon as he could, and used it with full knowledge of that condition; that he told his nephew, T. P. Eason, that he would sell it to him if he wanted it for just what he had in it; that in the fall of 1942, he sent some prospective purchasers to see the place and they saw both S. P. Eason and T. P. Eason and looked over the property; that at about the same time he executed an option for its sale, expiring on January 10th, 1943; that on January 1st, 1943, T. P. Eason came to see him about renting the place for 1943, and was told that he couldn't rent it because of the option and because he wanted his money out of it, and the first man that brought him $3,500 after the option expired would get it; that T. P. Eason said he knew another place he could get, but if the property wasn't sold, he would like to get it for

1943; that he, T. P. Eason, would call him on January 11th; that T. P. Eason did not come back to see him or call him on January 11th, and he sold the farm on January 12th, 1943, to John E. Rose, Jr.; and that the use and occupation of the farm was a family affair and his brother and nephew used the place in that relation more than anything else.

On January 15th, 1943, P. M. Eason informed T. P. Eason by letter that he had sold the farm to J. E. Rose, Jr., instructing his nephew to move his wire fences and hog houses so as to clear the place for the immediate possession he had promised the new owner, adding that he thought the latter would treat him all right about any crops already planted.

S. P. Eason testified "that P. M. Eason offered to sell the farm to T. P. Eason for $2,500.00 but he told his son that his brother didn't have that much in the place and not to give that for it; that P. M. Eason promised to let him have the place for what he had in it, but never did give him the amount, and that if he did not buy it and the place was sold to someone else then he was to pay him for his crops on the farm and move away." He further said that in the year 1938 his son, the defendant, began to farm the place.

J. E. Rose, Jr., testified that he purchased the farm on January 12th, 1943, and received a deed for it three days later; that he then went to see T. P. Eason and told him he had bought the place and asked him if he could get off in a week; that T. P. Eason told him "No, but that he would get off by February 1st"; that he made arrangements for taking over the farm on February 1st, and in the meantime T. P. Eason took down nearly all of the permanent fence and removed a permanent hog feeder house; and that when he went to get possession on February 1st, he was told by T. P. Eason that he had decided he wasn't going to move and was going to farm the place in 1943.

The evidence of T. P. Eason, in his own behalf, presents little conflict with the foregoing. He testified that although he had never had any specific agreement with his uncle about the farm, he had for five years paid him $100 per year, which he considered its worth as rent; that he paid no atten-

tion to the prospective purchasers who viewed the farm; that on January 1st, 1943, he went to Portsmouth, Virginia, to pay the rent for 1942, and then learned that P. M. Eason had given the option mentioned, and was told that he could not rent the farm for 1943 because of the option, and his uncle's expectation that he would sell the farm; that, at that time, he had planted nine acres of oats and three acres of pasture; that he did not call his uncle back and didn't know what happened about the prospective sale until the plaintiff came to him and told him that he had bought the farm and wanted him to get off in a week; that he told the plaintiff that he couldn't get off in a week, but would get off about the first of February, if he could find another place; that when Rose, the purchaser, came to see him on February 1st, he told him he could not find another place and had decided he was going to farm the land for 1943; that in the meantime he had moved one of the hog houses and had taken down most of the fence on the farm; that in the late fall of 1942, he had purchased some lumber for the purpose of erecting a barn on the property, expecting to stay there or buy the farm as soon as his uncle "figured up" the amount he had in it; that P. M. Eason had told him he would take $2,500, but after talking with his father, he decided not to pay that much; that while the case was pending on appeal, he "cut his oats and pasture," and planted twenty-two acres of peanuts, an acre of Irish potatoes and eight acres of corn, which he valued at $750; and that the reason he continued to stay on the farm was that he wanted to buy it and was waiting for a correct price from his uncle, which price he had not been given.

The law is not in dispute. The real question is whether or not an estate at will or a tenancy from year to year was created under the established facts.

There is, as we have said, little conflict in the evidence, which was heard *ore tenus*. We do not have a case of a tenant merely in possession under a lease for an indefinite term or under a general permission to occupy, with an agreement to pay a periodical rent, and holding over at the

expiration of his term. Nor do we have an estate at will arising *by implication of law*, which became an estate from year to year, through the payment and acceptance of rent. The rule applicable to such cases is not in point here.

The evidence here shows an express agreement between the landlord and the tenant. The tenant was put in possession under an option to purchase, but if he failed to exercise his option, and the land was sold to someone else, his right of possession then terminated. The land was thus held by the tenant during the joint will of both parties.

T. P. Eason does not deny this agreement. His actions fully corroborate it. He testified that he used the land with the expectation of buying it. He placed permanent fixtures thereon and bought lumber and material to erect buildings, and said he would have bought it had he received a price satisfactory to him. However, upon the advice of his father, he refused to pay $2,500 for the place. He knew that his uncle had purchased the property in an effort to assist other members of his family, and, if neither he nor his father would buy it, he intended to sell it as soon as he could find another purchaser. For eighteen years S. P. Eason had an opportunity to repurchase the farm. T. P. Eason for five additional years neglected or refused a similar opportunity to purchase it at a sum much less than the price for which it was subsequently sold. It was only after he had declined to pay the price offered to him and after other prospective purchasers had visited the land that, on January 1st, 1943, he attempted to rent the land for the year 1943. His promise given to Rose to remove from the premises about February 1st, 1943, and the actual removal of a portion of the structures erected thereon by him evidence his full knowledge of the agreement with his uncle that possession was to be surrendered when sale was made.

The evidence amply supports the conclusion of the trial judge that the defendant was a tenant at will.

The established law in Virginia is admirably stated in Minor on Real Property (2nd Ed., Ribble), Vol. 1, section 356:

■ "An estate at will arises where lands or tenements are *expressly demised* by one person to another to be held *during the joint wills of both parties;* or it may arise *by implication of law* wherever one person is put in possession of another's land *with the owner's* consent, but under an agreement which *does not suffice* to create in the tenant an estate of freehold or for years."

■ In section 357, Dean Ribble further says: "It seems clear that if no term is mentioned and the estate is expressly declared to be at the will of one of the parties, nothing being said as to its binding effect on the other, it is an estate at the will of both parties, and either may terminate it at his option."

T. P. Eason was in possession by the agreement and consent of the landlord. He was neither a trespasser nor a tenant for a certain period. He held at the will of both parties and, under such circumstances, he or the lessor had the right to terminate it at pleasure. Many of the cases hold that an estate at the will of one party must be likewise at the will of the other party. *Cowan* v. *Radford Iron Co.,* 83 Va. 547, 551, 3 S. E. 120.

See *Harrison* v. *Middleton,* 11 Gratt. (52 Va.) 527, where it was held that a tenant who had agreed, by writing under seal, that he would surrender possession when requested by a purchaser became a mere tenant at will or at sufferance.

Also see Tiffany on Landlord and Tenant, Vol. 1, section 13 *et seq.;* 32 Am. Jur. section 66; and 35 C. J. Landlord and Tenant, section 342.

■ ■ In an estate at will expressly created, where rent is to be paid by the tenant, the tenant is liable for rent in accordance with the intent and agreement of the parties. The payment of such rent does not alter the agreement as to the character of the tenancy. An estate expressly stipulated to be a tenancy at will must be so regarded. It is the contract of the parties. The express understanding removes all questions relating to the effect of the acceptance of rent or to the necessity of notice for removal. The option to terminate the tenancy may be exercised at the pleasure of

either the lessor or lessee, in accordance with their agreement.

The second assignment of error is without merit. The judgment of the trial court does not mention crops. The record does not show that any question was raised or decided as to the tenant's right to emblements. The defendant excepted to the judgment of the trial court solely as contrary to the evidence and without evidence to support it. The question of emblements is not presented to us for review.

The defendant has filed a motion to dismiss the writ of error upon the ground that all questions in issue are now moot. This motion is supported by affidavits showing that since the rendition of the judgment of the trial court and the award of the writ, T. P. Eason, on December 31st, 1943, has vacated the land and delivered its possession to the appellee, after removing therefrom all crops and effects of every kind belonging to him. In view of the conclusion we have reached on the merits, it is unnecessary to consider this motion.

The judgment of the trial court is plainly right and it is accordingly affirmed.

*Affirmed.*