**WATERFALL FARM SYSTEMS, INC., Plaintiff,**

v.

**Allan M. CRAIG, III, Carol S. Craig and Future Farms of Virginia, Inc., Defendants.**

**Civil No. H–94–1247.**

United States District Court, D. Maryland.

Sept. 22, 1995.

Jerome T. May, Annapolis, Maryland, for plaintiff.

James A. McGuire, Edgewater, Maryland, Barry J. Dalnekoff and Dalnekoff & Mason, P.A., Annapolis, Maryland, and Myron Cohen and Cohen, Pontani, Liberman & Pavans, New York City, for defendants.

## MEMORANDUM OPINION

ALEXANDER HARVEY, II, Senior District Judge.

In this civil action, a corporation is suing two minority stockholders and a corporate entity formed by them. The stockholder defendants are the owners of certain real property which the corporate plaintiff sought to lease for the purpose of conducting its business of growing and selling hydroponic products. When serious disputes arose between the majority and minority stockholders, plaintiff filed this civil action in this Court seeking substantial damages and other relief under various legal theories.

Plaintiff Waterfall Farm Systems, Inc. (hereinafter "Waterfall" or "the Corporation") has here sued minority stockholders Allan M. Craig, III and his wife Carol S. Craig (hereinafter "the Craigs"). Also named as a defendant is Future Farms of Virginia, Inc. (hereinafter "Future Farms"), a corporation formed by the Craigs in 1992. The Craigs are the owners of real property located near Neenah, Virginia, on which they have built a greenhouse. The Craigs joined with Antonea and John Chapin (hereinafter "the Chapins") and Linda and Colin Banks (hereinafter "the Banks") in forming Waterfall in February of 1993. Following its incor-

poration, Waterfall began to conduct its new hydroponic business at the Craigs' greenhouse. Like any new business, the parties encountered various start-up problems, and there were numerous disputes as to the existence of and the interpretation of agreements between the parties. When serious differences arose between the Craigs and the Chapins and when the Chapins and Waterfall later sued the Craigs on separate occasions in state court, the Craigs on March 21, 1994 ordered Waterfall to vacate their premises, asserting that no lease existed between the parties. At the instance of the majority stockholders, Waterfall then filed this suit in this Court on May 11, 1994, seeking a declaratory judgment, injunctive relief and substantial compensatory damages.

Following discovery and other pretrial proceedings,[1] a Pretrial Order and a Supplemental Pretrial Order were entered. The case then came on for trial before the Court sitting without a jury.[2] The principal parties and other witnesses testified at the trial, and numerous exhibits were admitted in evidence. The testimony of the witnesses was conflicting in many respects, and in resolving the issues of fact, due regard has been given by the Court to the credibility of the witnesses and the weight their testimony deserves. Pursuant to Rule 52(a), F.R.Civ.P., findings of fact and conclusions of law are contained in this Memorandum Opinion, whether or not so characterized.[3]

## I

### Facts

The background facts are not seriously disputed. It is the interpretation of those facts and their application to the controlling principles of law which are at issue here.

Both the Craigs and the Chapins reside in Annapolis, Maryland. Allan Craig has for some years been employed by S.D. Warren Company (hereinafter "Warren"), a paper company with offices in Landover, Maryland.

---

1. In its Memorandum and Order of April 10, 1995, the Court denied Waterfall's motion for partial summary judgment on Count III of the complaint.

2. Pretrial briefs were filed by the parties.

3. As directed by the Court, the parties have submitted proposed findings of fact.

At one time, both Allan Craig and John Chapin worked for Warren in New York City, and they then knew each other casually. They later both moved to Annapolis, and in the years before February of 1993, the Craigs and the Chapins had a friendly relationship, having on occasion entertained each other in their homes.

During the 1980's, John Chapin was engaged in the general construction business in the Annapolis area. He discontinued that business in the early 1990's, and began to look for another business opportunity. His wife Antonea worked full time for a window products company until 1991.

Carol Craig is a member of the bar of the State of Maryland. She is engaged in the general practice of law with the Annapolis firm of Dalnekoff and Mason and at one time was President of the Anne Arundel County Bar Association. In 1986, the Craigs purchased an abandoned farm in Neenah, Virginia. They built a cabin on the property and for several years used it for recreational purposes.

In 1990, the Craigs became interested in hydroponic farming. Hydroponics is the growing of plants and vegetables with their roots immersed not in soil but in an aqueous solution containing essential nutrients. In hydroponic farming, plants are thus grown without soil, but are instead supplied with nutrients and water to promote plant growth under controlled environmental conditions. Neither the Craigs nor the Chapins had any experience in hydroponic farming before they formed Waterfall in February of 1993.

In the fall of 1990, the Craigs met one Edward Blume who was in the business of producing and selling commercial hydroponic production systems in Florida. Following discussions with Blume and a visit to his hydroponic operation in Florida in the spring of 1991, the Craigs decided to join with Blume in a venture involving the growing of hydroponic lettuce on their Virginia farm. They contracted with Blume for the construction of a greenhouse on their Virginia property to be used in connection with this business venture. They first approached the Chapins in May of 1991 suggesting to them that the Chapins might want to become in-volved as investors. At the time, the Chapins were not interested.

A dispute arose between the Craigs and Blume in 1992 during which time Blume referred the Craigs to a partner of his, one Colin Banks. Banks was a citizen of Great Britain who had resided in Florida for a number of years and who was then in the plastics business, including the manufacture of plastic growing apparatus for hydroponic products. In May of 1990, Banks, who had some experience as an inventor, had applied for the issuance of a process patent for a hydroponic system. When the Craigs discontinued their dealings with Blume, Banks came to Virginia and assisted the Craigs in their efforts to complete construction of the greenhouse on their property.

Once again, the Craigs approached the Chapins, suggesting in August of 1992 that the latter might be interested in investing in a proposed hydroponics project. The Chapins were not at the time interested in making an investment in the project, but instead proposed a corporate structure based upon equal stock ownership by the Craigs, by the Banks and by the Chapins. One proposal being then considered was that a hydroponic system be designed, operated and used as an example so that similar systems could later be marketed to others. A meeting attended by the Craigs, the Chapins and Colin Banks was held on Labor Day, September 7, 1992, at which there were further discussions among the parties. Later, in October of 1992, the Chapins traveled to Florida, met with Banks, and observed his hydroponic system being then used by a Florida grower known as Clyde Ricketson. Thereafter, discussions continued between the parties, and a plan gradually took form. On December 30, 1992, an organizational meeting was held at the offices of Dalnekoff & Mason in Annapolis with the Craigs and the Chapins in attendance and with the Banks available by telephone. At that meeting, there were further discussions concerning participation by the parties in a hydroponic farming business.

On February 26, 1993, the Craigs, the Chapins and the Banks met in Annapolis for the purpose of forming a new corporation

which would conduct the new business venture. The parties executed a document entitled "Incorporators' Letter of Agreement" (hereinafter "the Letter of Agreement"). In a section entitled "OVERVIEW," that document noted that the initial capital expense associated with completion of a facility, plus land cost, could be onerous and potentially difficult to finance through conventional means. It was provided that the Banks, in exchange for a one-third ownership interest in the Corporation, would assign to the Corporation the patent which was then being obtained by Colin Banks and which covered a process for growing hydroponic products and that Colin Banks would also provide technical and consultative services to the Corporation. Insofar as the Craigs were concerned, the Letter of Agreement provided as follows:

> *CRAIGS:* shall, in consideration of and in exchange for ⅓ ownership in the Corporation, provide marketing efforts for the Corporation and its products; participate actively in the development of the Corporation and its interests; assign by lease agreement with the Corporation, full use and control of their hydroponic greenhouse located in Neenah, Virginia, providing all equipment, buildings and land related to this greenhouse operation. The term of the lease shall be three (3) years, renewble [*sic*] for four (4) three-year terms. Rent for the lease of the greenhouse shall be paid to the Craigs at the rate of Nineteen Hundred Dollars (1,900) monthly for the first year; thereafter, any increases in rent shall be at the discretion of the Board of Directors. Craigs agree to waive the payment of rent until September 1, 1993, at which time, in the event the Corporation is unable to honor its rent commitment, all amounts due under the lease shall become an obligation of the Corporation.
>
> Craigs shall not participate in salary remuneration for their efforts until such time as they are actively involved in full-time participation of corporate business.

Insofar as the Chapins were concerned, the Letter of Agreement provided as follows:

> *CHAPINS:* shall, in consideration of and in exchange for ⅓ ownership interest in the Corporation, provide full-time efforts in actively developing and managing the interests of the Corporation in all phases.
>
> It is understood that this is a salaried participation, but that remuneration is solely dependent on corporate income and profitability. Compensation in the future, however, will reflect their willingness to have accepted this risk and their ability to develop the corporate interests as a profitable and growing entity.
>
> It is the primary objective of the Incorporators that the Chapins' financial security be maintained.

Various documents were then prepared by Carol Craig, including articles of incorporation for Waterfall, corporate by-laws and minutes of the first meeting. Equal shares of stock were to be issued to the Banks, to the Chapins and to the Craigs. John Chapin became President, Colin Banks and Allan Craig became Vice Presidents, Carol Craig became Secretary and Antonea Chapin became Treasurer. No lease agreement was executed at the time, nor did the parties execute any employment agreement relating to the salary and other compensation to be paid to the Chapins. Colin Banks did assign to the Corporation his patent rights by Assignment executed by him on May 26, 1993 and accepted by John Chapin as President of Waterfall. Somewhat later, on October 12, 1993, United States Patent No. 5,252,108 was issued to Colin Banks, covering a "Hydroponic Farming Method and Apparatus."

Almost from the outset, disputes arose between the parties. In particular, the Craigs and the Chapins could not agree on the terms of certain necessary documents, including a lease agreement and an employment agreement. During the spring of 1993, the greenhouse had not as yet been completed, and it was therefore not immediately operational. The Craigs did not have sufficient funds available to complete the construction, and as a part of the understanding between the parties, the Chapins agreed to loan sums to the Craigs for completion of the greenhouse and for the purchase of the necessary equipment to be attached for use in the business.

The first serious dispute between the Chapins and the Craigs related to the promissory

notes to be executed by the Craigs covering the loans. The first such loan was in the amount of $20,000, and Carol Craig objected to provisions of the note covering that loan. Although the amount of the loan was to be repaid in a year, the note also provided that repayment was due on demand. The note also gave the Chapins the right to confess judgment against the Craigs in an appropriate court if amounts were not paid when due. Although that note was executed and delivered to the Chapins, Carol Craig objected to the demand feature of this first note. The second amount loaned by the Chapins was $6,000, and thereafter a loan of $10,146 was made. Although they had received the money, the Craigs refused to execute notes for these two loans in the form requested by the Chapins. The $6,000 loan was made on March 31, 1993 but a note was not signed and given to the Chapins until May 28, 1993. $10,146 was advanced to the Craigs on May 16, 1993, but a note was not executed and delivered until May 28, 1993. Both of these last two notes were in a form approved by the Craigs, and they contained no demand provisions.

Similar problems arose concerning the form and contents of the lease agreement to be executed by the parties. A formal lease was wanted by John Chapin. Carol Craig submitted various drafts of the terms of a lease which would be acceptable to the Craigs, and in turn Randall Goff, Esq., attorney for Waterfall, submitted drafts containing terms acceptable to the Corporation. Indeed, Carol Craig submitted five such drafts while Goff submitted two on behalf of the Corporation. However, despite ongoing negotiations, no agreement was ever reached by the parties concerning the terms whereby Waterfall would lease the Craigs' greenhouse.

Another dispute arose when the Chapins insisted that there be an employment agreement between them and the Corporation. They submitted documents to the Craigs whereby the Corporation would agree to pay the Chapins $375,000 over the first three years of the operation of the business, with interest bearing notes covering amounts not paid by the Corporation. The Craigs objected, claiming that, as indicated by the Letter of Agreement, any remuneration to the Chapins was dependent solely on corporate income and profitability.

Meanwhile, work was under way for the completion of the greenhouse. The Craigs' son Peter, a college graduate in his early 20's, met with Colin Banks at the site on two different occasions between February and May of 1993. Banks assisted Peter in completing the construction [4] and provided the plastic mechanisms necessary for operation of the system. By the time that construction of the greenhouse had been completed and it had been fully equipped, the Craigs had expended a total of $250,000 for these purposes. The Chapins and also the Craigs each contributed on a 50/50 basis approximately $25,000 to the Corporation to cover operating expenses during the start-up period. A local resident, one Denise Mingo, came to work for Peter Craig on May 20, 1993 and helped him get the project off the ground. Like the Craigs and the Chapins, Denise had no experience in hydroponic farming. By June, two-thirds of the greenhouse was ready for production of a crop, and by the end of the summer the remaining section was also ready. The first crop of lettuce was produced in July. Disappointed in the manner in which John Chapin was handling his responsibilities, Peter Craig stopped working at the greenhouse on September 1, 1993.[5] Mingo then took over his duties.

The various disputes between the Craigs and the Chapins escalated during the summer and fall of 1993. In his letter of June 11, 1993 to the Craigs, John Chapin accused them of "intentional deviousness and adversarial treatment." He termed a prior letter received by him from the Craigs to be "offensive, provocative and thoughtless." In a letter to the Craigs dated September 13, 1993, John Chapin stated that he and his wife

---

4. In his testimony, Banks described the Craigs' greenhouse as a "magnificent structure" and stated that he had "never seen anything better."

5. Peter was never paid for his work during the spring and summer of 1993, except for the month of August when he received $1,000 from Waterfall.

could not go forward in the endeavor unless an understanding was reached. He insisted that the Craigs execute "documents produced by our attorney" before September 18, 1993 or the Chapins would assume that the business of the Corporation could not go forward and they would be compelled to take action necessary to wind up the corporate affairs. Although the Craigs did not meet this deadline, the Chapins did not carry out their threat.

When agreement was not later reached on the form and content of the documents and when the Craigs did not deliver to the Chapins a signed lease satisfactory to them, John Chapin once again threatened in a memorandum dated October 6, 1993 to end the Corporation's relationship with the Craigs. He stated that unless there was a ratified lease prior to October 13, 1993, the Chapins would cease in their capacity as managers of the business of the greenhouse.

On October 12, 1993, the parties met in an attempt to resolve their differences. The meeting lasted some seven hours. John Chapin came up with a new idea, namely that if the Craigs surrendered their shares of the Corporation and entered into a formal lease of the greenhouse until September 1, 1994, the Corporation would surrender possession of the property on that date. This proposal was rejected by the Craigs. The various disputes between the parties led to a "deep distrust" on the part of the Chapins as to the Craigs' real motives. Similarly, the Craigs (including their son Peter) believed that they could not trust John Chapin. As early as October of 1993, John Chapin was considering the option of filing suit against the Craigs in a state court. In December of 1993, Carol Craig, but not her husband, wanted to withdraw from the venture. In spite of the disagreements between the parties, the Craigs did not withdraw.

In December of 1993, the Chapins did sue the Craigs in a state court. On October 8, 1993, Carol Craig had executed a promissory note in favor of the Chapins in the amount of $4,660.77. This sum represented the Craigs' share of accumulated start-up costs due and owing at the time. The note was due and payable on December 1, 1993 and contained a confessed judgment provision. John Chapin had been pressing Allan Craig to complete work on the driveway at the site and to install heaters. Dissatisfied with Allan Craig's response, the Chapins on December 7, 1993, filed a confessed judgment action against the Craigs in the District Court of Maryland for Anne Arundel County, seeking to enforce payment of the $4,660.77 note. In a memorandum dated December 17, 1993, John Chapin threatened to demand payment by the Craigs of the other notes outstanding unless the $4,660.77 plus interest was paid by December 24, 1993. This deadline was met by the Craigs who paid the note in full by that date, with the understanding that the Chapins would not confess judgment on the other notes.[6]

Meanwhile, John Chapin directed Goff, Waterfall's attorney, to prepare another suit to be filed against the Craigs in the Circuit Court for Anne Arundel County. This was an action to be brought by Waterfall against the Craigs seeking a declaratory judgment that a lease in fact existed between Waterfall and the Craigs. Although Goff advised the Chapins that such a suit had been filed by him in December of 1993, this was not true; the suit in question was not filed in that month. This declaratory judgment action was eventually filed in the Circuit Court for Anne Arundel County on March 7, 1994. However, it was not until a week later, Monday, March 14, that the Craigs learned that they had been sued a second time. Believing that no lease of the greenhouse existed and having been sued once by the Chapins and once by Waterfall, the Craigs decided to take steps to terminate their relationship with Waterfall. On March 16, 1994, they paid the Chapins all amounts owed to them on the remaining notes which were outstanding, plus interest due.

On March 21, 1994, the Craigs sent a memorandum to the Chapins and to the Banks which provided as follows:

---

6. The Chapins spitefully allowed the judgment to remain of record for some three months and did not file an Order of Satisfaction in the case until March 23, 1994.

This is to advise you that Waterfall Farm Systems, Inc. is no longer operative at our greenhouse in Neenah, Virginia. Neither you nor your agents is welcome on our farm, and instructions have been given that, if any one should try to enter, the Virginia State Police are to be called and a trespass reported.

That same day, Carol Craig withdrew $1,115 from the Waterfall bank account and later paid Denise Mingo what she was owed by the Corporation.

After March 21, 1994, the Craigs took over the operation of the hydroponic business at their greenhouse. Denise Mingo had earlier told them that if the Craigs terminated their relationship with Waterfall, she would be willing to stay and run the business. However, on Saturday, March 19, Mingo brought to the attention of the Craigs the fact that she had signed on September 28, 1993 a document entitled "Covenant Not to Compete," whereby she purportedly agreed not to be during a two year period an employee of any hydroponic farming business of any current stockholder of the Corporation. The Craigs had no knowledge of this document when they had previously asked Mingo to work for them in the future. Carol Craig consulted with an attorney in Warsaw, Virginia who advised her that the document in question did not constitute a valid and enforceable non-competition agreement. The Craigs then decided to go forward with Mingo's employment. On March 21, 1994, Mingo sent a letter to Waterfall resigning as an employee of the Corporation.

Responding to the Craigs' eviction action, John Chapin was particularly vindictive. He called six Waterfall customers and told them that the Craigs had stolen Waterfall's crop. He filed criminal charges in state court against Carol Craig accusing her of wrongfully withdrawing funds from Waterfall's bank account.[7]

After March 21, 1994, the Craigs operated the business at their greenhouse under the name of their corporation, Future Farms.

New labels and stickers were ordered, and Waterfall's name was not used when lettuce was shipped to customers. Lettuce being perishable, the product being grown on the date of the eviction was picked and sold by defendants for the account of Waterfall in order to avoid waste and loss. When John Chapin called customers and told them that Waterfall's product had been stolen, most of them returned to Future Farms what had been shipped to them. Both sides lost the benefit of these sales. Waterfall also refused to accept Carol Craig's offer to account for and pay Waterfall for those sales of the Corporation's product which had been completed. When the Craigs took over, personal property of Waterfall remained on the premises, and the Craigs offered to return to Waterfall that personal property. Once again, Waterfall refused to accept the offer.

During the 10 months when it had been occupying the greenhouse, Waterfall had operated at a loss. Even though in 1993 no compensation was paid to the Chapins and no rent was paid to the Craigs, Waterfall's loss for that calendar year still came to $23,327.

On May 11, 1994, plaintiff Waterfall instituted this civil action in this Court naming as defendants the Craigs and also Future Farms.[8]

## II

### The Claims

Plaintiff's complaint contains eight counts. Count I alleges patent infringement by defendants, and Count II seeks a recovery from defendant Future Farms under the Lanham Act. Count III seeks a declaratory judgment that a lease exists between plaintiff Waterfall and the Craigs covering the greenhouse. Count IV seeks an injunction against the Craigs enjoining them from continuing to conduct plaintiff's business. Count V alleges breach of contract by the Craigs, and Count VI asserts a claim against the Craigs of tortious interference with contract. Count VII is based on a claim of conversion against

7. These charges were later withdrawn.

8. The suit previously filed by Waterfall in the Circuit Court for Anne Arundel County was dismissed without prejudice after this civil action was instituted in this Court.

the Craigs, and Count VIII seeks a recovery from the Craigs based on the allegation of breach of fiduciary duty.

In each of Counts V through VIII, plaintiff seeks compensatory damages in excess of $5,590,000 based on a claim of lost profits projected over a period of 15 years. In Counts I and II, treble damages in excess of $15,300,000 are sought, as well as attorneys' fees.[9]

Defendants have answered the complaint, have raised numerous affirmative defenses and have asserted a counterclaim against plaintiff. An Order has been entered granting defendants' motion for separate trials of plaintiff's claims against defendants and of defendants' counterclaim against plaintiff.

### III

#### The Lease Issue

■ The parties agree that the primary issue which the Court must decide in this case is whether or not, as of February 26, 1993, a lease existed between Waterfall and the Craigs covering the greenhouse on the Craigs' Virginia property. Relying on provisions of the Letter of Agreement of February 26, 1993, plaintiff Waterfall contends that once the Craigs executed that document, such a lease existed, the term being three years renewable for four three-year terms with the rent to be paid at the rate of $1,900 a month for the first year. The issue is a critical one. If the Court were to determine that such a lease in fact existed, then the Craigs would have breached their agreement with Waterfall on March 21, 1994 when they evicted it from their property. Under such circumstances, the Craigs would not thereafter have been entitled to conduct the business of growing hydroponic products at their greenhouse and to thereafter sell these products in the name of Future Farms, their corporation.

Relying on other provisions of the Letter of Agreement and on evidence of the parties' intentions, defendants contend that the Letter of Agreement was no more than a letter of intent. According to defendants, the parties intended that a formal lease agreement would be later executed, and since no agreement was ever reached as to the terms of the lease, Waterfall was occupying their property as a tenant at will. Under such circumstances, the Craigs would have the right to order Waterfall to vacate their property and would have the further right to thereafter conduct a legally permissible business on their property.

Following due consideration of all the evidence produced at the trial and in particular the credibility of the witnesses, this Court finds and concludes that no binding lease agreement was ever reached between the parties.[10] Whether the parties negotiating a contract intended to be bound by a prior writing or whether they did not intend to bind themselves until a formal agreement was prepared and signed by them must be determined from the facts and circumstances in each particular case. *Peoples Drug Stores, Inc. v. Fenton Realty Corp.*, 191 Md. 489, 493, 62 A.2d 273 (1948). The evidence here does not indicate that the parties intended on February 26, 1993 to bind themselves to an enforceable contract of lease. The Letter of Agreement was no more than a non-binding letter of intent, containing some but not all of the terms of an enforceable contract. Based on the evidence presented at the trial, the Court finds that the parties intended that several additional documents would have to be agreed upon and executed by them before a binding and enforceable contract existed.

In making this determination, the Court will rely on its opinion in *Phoenix Mutual Life Ins. Co. v. Shady Grove Plaza Ltd.*, 734 F.Supp. 1181, 1188 (D.Md.1990), *aff'd* 937 F.2d 603 (4th Cir.1991). In that case, this Court granted defendant's motion for summary judgment, holding that pretrial evidence of record established that the parties

---

**9.** Plaintiff also sought punitive damages in some of the counts of its complaint. In its Memorandum and Order of July 19, 1995, the Court ruled that plaintiff was not as a matter of law entitled to recover punitive damages in this case.

**10.** Plaintiff Waterfall was not a party to the Letter of Agreement of February 26, 1993, which was executed by the Chapins, the Craigs and the Banks.

had never reached agreement and that therefore no action for breach of contract would lie. As in this case, this Court determined in *Phoenix Mutual* that the letter of intent at issue there was not an enforceable contract. Citing *Teachers Insurance and Annuity Association v. Tribune Co.*, 670 F.Supp. 491 (S.D.N.Y.1987), this Court in *Phoenix Mutual* considered the following five factors in determining whether the facts at issue revealed an intent by the parties to be contractually bound: (1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the custom of such transactions. *Id.* at 1187. When these same five factors are applied to the facts of record here, this Court finds and concludes that no enforceable lease agreement existed on February 26, 1993.

First, there is language contained in the Letter of Agreement itself indicating that further action by the parties would be necessary before an enforceable lease existed. It was provided that the Craigs "*shall* ... assign by lease agreement with the Corporation, ..." (Emphasis added). This executory language clearly contemplated future action by the Craigs before a lease would exist. As Carol Craig testified, the Letter of Agreement contained merely basic ground rules. She also testified that it was understood at the meeting of February 26, 1993 that a formal lease agreement would be later prepared and that the proposed commercial lease be taken to a Virginia attorney to be sure that it complied with Virginia law.

Although certain terms of the contemplated lease including the rent payable were set forth in the Letter of Agreement, other material and necessary terms were not addressed, including, *inter alia,* a precise description of the property leased, provisions relating to the parties' rights of ingress and egress to the greenhouse, provisions relating to the lessee's obligation to repair damages caused by it to the premises and the equipment, limitations on subletting of the property, environmental rights and guarantees, rights of the lessor in the event of default and provisions relating to the amount and type of liability insurance to be carried by

Waterfall as the lessee. These essential terms had been left open and were the subject of further negotiations.

After the Letter of Agreement was signed, both the Craigs and the Chapins proposed for inclusion in the lease terms which had not been addressed in the earlier document. The Craigs' first draft of the lease agreement included the specific elements mentioned in the Letter of Agreement. Later negotiations between the parties led to modifications of these elements in subsequent drafts. When the Chapins made a substantial salary demand which would have constituted indebtedness of the corporation whether or not the venture was profitable, the Craigs increased their rent demand.

The Letter of Agreement in fact contemplated that several other documents were to be prepared and executed by the parties before they would be contractually bound. There was to be an assignment by Colin Banks of his patent rights to the Corporation, and, according to the Chapins, a formal employment agreement necessarily had to be executed before the Chapins' rights and obligations were firmly fixed. Although an assignment of the patent rights was prepared and executed, agreement was never reached between the parties as to the terms of the lease agreement or as to the terms of the Chapins' employment agreement. In his memorandum to the Craigs of August 23, 1993, John Chapin noted that there were many items "on the table" that require "our immediate attention" and stated: "I am not comfortable in dealing with them and will not until *all* agreements are accepted and ratified by all of us." (Emphasis in original). There is a strong presumption against finding a binding agreement when the parties expressly contemplated the future preparation of and the execution of a formal contract document. *Phoenix Mutual,* 734 F.Supp. at 1188, *citing Teachers,* 670 F.Supp. at 499.

The context of negotiations between the parties also discloses their intent that the Letter of Agreement was not to be a binding enforceable contract. In an early listing of matters to be addressed, Allan Craig in his memorandum to the Craigs of February 4, 1993 noted that it would be necessary to

"Draft a lease agreement for greenhouse to corporation." In his letter to the Craigs of June 11, 1993, John Chapin acknowledged that at the February, 1993 incorporators' meeting "Carol was insistent that the terms of your lease be incorporated—details that we were not prepared to approve at the time." John Chapin also recognized in that letter that if agreement could not be reached on the various details, "the Banks walk away with their patent—you are left with a working greenhouse which will continue to generate income. . . ." He complained, however, that the Chapins would be "left with a goose egg!" In his letter of September 13, 1993, Chapin acknowledged that the stockholders of the corporation had at the beginning "all executed *a letter of intent* outlining our expectation in this business venture." (Emphasis added). Letters of intent and negotiations ordinarily do not constitute binding contracts and will not be enforced by the courts, in part because "the financial community does not regard [a letter of intent] as a binding agreement, but rather, an expression of tentative intentions of the parties." *Phoenix Mutual,* 734 F.Supp. at 1187, quoting *Dunhill Securities Corp. v. Microthermal Applications, Inc.,* 308 F.Supp. 195, 198 (S.D.N.Y.1969).

After February of 1993, Chapin pressed the Craigs for the execution of a formal lease agreement. For months, there were continuing and extensive negotiations between the Chapins and the Craigs concerning the terms of the final document. Carol Craig submitted five separate drafts of the form of a lease which would be acceptable to the Craigs. Significantly, John Chapin did not at that time take the position that a lease agreement already existed. Rather, he directed Randall Goff, Waterfall's attorney to present to the Craigs at different times two separate drafts of a lease agreement which would be acceptable to the Chapins. Drafts of an employment agreement were likewise considered by the parties.[11] Continual redrafting of a docu-

ment indicates the importance of the terms being negotiated and the parties' intention not to be bound until final execution of a written agreement. *Phoenix Mutual,* 734 F.Supp. at 1189, *citing Knight v. Sharif,* 875 F.2d 516, 524 (5th Cir.1989).

Significantly, John Chapin himself recognized that in the absence of a formal lease, the Chapins had the right to decline to go forward. In his letter of September 13, 1993, he insisted that the Craigs execute the documents produced by his attorney or the Chapins would not go forward and would take necessary action to wind up corporate affairs. He noted that "Since February, 1993, we have been having a great deal of difficulty in finalizing the corporation's documents, including the employment agreements and lease, for the business." His threat of not going forward was repeated in a memorandum dated October 6, 1993 when John Chapin stated that unless there was a ratified lease prior to October 13, 1993, the Chapins would cease in their capacity as managing the business of the greenhouse. In his September letter and in his October memorandum, John Chapin claimed the right to do exactly what the Craigs later did on March 21, 1994, namely, withdraw from the proposed arrangement because there was no binding contract between the parties. As the Court of Appeals of Maryland has recognized, until actual completion of the bargain "either party is at liberty to withdraw his consent and put an end to the negotiations." *Peoples Drug Stores,* 191 Md. at 494, 62 A.2d 273.

Plaintiff relies on the fact that there was in this case partial performance of the proposed agreement by the parties. Colin Banks did assign his patent rights to the Corporation, and Waterfall did operate on a start-up basis the business of selling lettuce which had been hydroponically grown. Nevertheless, agreement was never reached as to those aspects

---

11. Plaintiff argues that the Craigs improperly included in their later drafts of the lease agreement a provision making payment of rent subject to the terms and provisions of an agreed method of paying compensation to the Chapins. But plaintiff's attorney included just such a tie-in provision in a draft acceptable to plaintiff.

Goff's second draft contained language indicating that payment of rent would be adjusted "pursuant to a Method of Payment as to Compensation for Antonea and John Chapin and Property Rental of even date ('Method Agreement')" . . . . (Defendants' Exhibit No. 101).

of the overall arrangement between the parties which were of critical significance both to the Craigs and to the Chapins. Essential to the Craigs, who had expended some $250,000 in the construction and equipping of the greenhouse on their property, was the protection of their property rights and the receipt of a reasonable return on their investment during the expected lengthy term of the lease. Essential to the Chapins, who were charged with providing full-time efforts in actively developing and managing the interests of the Corporation, was that they be adequately compensated for the efforts which they would be expending for these many future years. During the entire time that Waterfall conducted its business at the greenhouse, no rent was paid to the Craigs and no compensation was paid to the Chapins.[12] In spite of intense efforts by the parties over a period of many months, agreement was never reached concerning the ultimate terms of these critical elements of the over-all contract.

Finally, the custom and practice relating to transactions of this sort indicates that the parties intended that a preliminary letter of intent would be signed by them to be followed by a fully executed lease agreement. Substantial sums were involved and the term of the lease, if renewed, could have extended for some fifteen years. The magnitude of a transaction of this sort highlights the practical business need to have the parties' legal obligations recorded in a formal document. *Phoenix Mutual Life Ins. Co.*, 734 F.Supp. at 1188, *citing Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262–63 (2nd Cir.1984), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984).

In the absence of a binding lease agreement between the parties, Waterfall was occupying the greenhouse as a tenant at will. *See Restatement (Second) of Property*, § 1.6, Comment b. During the period of time when Waterfall was occupying the greenhouse by permission, no rent was paid to the Craigs, and no agreement had been reached as to the term of the tenancy. A tenancy at will may

endure only so long as both the landlord and tenant desire, and it may be terminated on the day when the notice of termination is received by the tenant. *Id.* As the Supreme Court of Appeals of Virginia held in *Eason v. Rose*, 183 Va. 359, 32 S.E.2d 66, 69 (1944), the option to terminate a tenancy at will may be exercised at the pleasure of either the lessor or the lessee.

For these reasons, this Court finds and concludes that there was no binding lease agreement in existence between plaintiff and the Craigs on March 21, 1994. The Craigs were therefore entitled to terminate the existing tenancy at will and to commence to operate a legally permissible hydroponic business in the greenhouse owned by them. Plaintiff is therefore not entitled to the declaratory judgment sought in Count III. Nor is plaintiff entitled to an injunction under Count IV enjoining the Craigs from continuing to conduct a hydroponic business on their property. Furthermore, defendants did not, as alleged in Count V, breach an existing agreement between the parties by failing to lease the greenhouse property to the plaintiff and by barring plaintiff from conducting its business there. Accordingly, judgment will be entered in favor of defendants as to Counts III, IV and V of the complaint.

## IV

### The Patent Claim

In Count I of the complaint, plaintiff alleges that defendants have infringed U.S. Patent No. 5,252,108 (hereinafter "the '108 patent") by operating their hydroponic business at the greenhouse after March 21, 1994. In opposing this claim, defendants assert (1) that the patent in suit is invalid under 35 U.S.C. § 102(b); (2) that the accused hydroponic farming method employed by the defendants does not infringe any of the claims of the patent in suit; (3) that plaintiff's patent is invalid or unenforceable because it was obtained as a result of inequitable conduct; and (4) that defendants are entitled to an

---

**12.** The Chapins did, without notice to or the consent of the Craigs, pay themselves rent for the office in the basement of their home.

award of attorneys' fees against plaintiff under 35 U.S.C. § 285 because this is an exceptional case.

Based on the credible evidence produced at the trial, this Court finds and concludes that the patent in suit is invalid under 35 U.S.C. § 102(b). It is therefore not necessary for the Court to consider the other defenses asserted by defendants to plaintiff's claim of patent infringement. The Court has further determined that this is not an exceptional case under 35 U.S.C. § 285 and that defendants have not met their burden of showing that they are entitled to an award of attorneys' fees.

35 U.S.C. § 102(b) provides as follows:

A person shall be entitled to a patent unless ... (b) the invention was ... in public use or on sale in this country more than one year prior to the date of the application for patent in the United States....

■ An invention offered for sale before the statutory cut-off date is deemed to be "on sale" within the meaning of § 102(b). *Chromalloy American Corp. v. Alloy Surfaces Co.*, 339 F.Supp. 859, 869 (D.Del.1972). Colin Banks filed his application for the '108 patent on May 10, 1990. The question before the Court then is whether he had placed his invention on sale or offered it for sale before May 10, 1989. To prevail under § 102(b), the party undertaking to prove patent invalidity has the burden of establishing by clear and convincing proof that it was the invention itself which was on sale. *Manville Sales Corp. v. Paramount Systems, Inc.*, 917 F.2d 544, 549 (Fed.Cir.1990). What must be determined is whether the device, system or process sold or offered for sale came within the scope of the claims of the patent. *In re Corcoran*, 640 F.2d 1331, 1333–34 (C.C.P.A. 1981).

■ The evidence here indicates that in early 1989 Colin Banks, in collaboration with his then partner Blume, offered and sold his hydroponic system to one Clyde Ricketson in Eustis, Florida for use in Ricketson's greenhouse. The process used by Ricketson came within the scope of the '108 patent. In his pretrial deposition, excerpts of which are a part of the trial record, Colin Banks readily admitted that what was sold to Ricketson through Blume was the system he later patented. On two separate occasions during his deposition, these essential facts were admitted by Banks. At page 26 of his deposition, Banks testified as follows:

Q. So, if I understand your testimony, your patent was used in the Ricketson greenhouse?

A. Yes.

Q. And do I also understand at some time later since we're talking about the Ricketson greenhouse, that Mr. and Mrs. Chapin were also shown the Ricketson greenhouse?

A. Yes.

Q. That was represented to them as being your system or patent?

A. Right, right.

Later, at page 28, Banks testified as follows:

Q. It [*sic*] a fair statement, Mr. Banks, that you had offered the process which later became a patented process to Mr. Ricketson to be used in that greenhouse on or about April 12th, 1989?

MR. MAY: I object.

A. Yes, I believe that's fair.

These admissions constitute clear and convincing evidence that the invention patented by Colin Banks had been offered for sale and was on sale more than one year before he filed his patent application on May 10, 1990. Evidence does not exist that the sale to Ricketson was primarily for experimental purposes in order to test the invention. *See Baker Oil Tools, Inc. v. Geo Vann, Inc.*, 828 F.2d 1558, 1563 (Fed.Cir.1987). A viable commercial operation was being conducted in early 1989 in the Ricketson greenhouse, using Banks' system for hydroponic farming. Accordingly, plaintiff's claim of patent infringement must fail.

In an effort to avoid the consequences of the admissions made by him during his earlier deposition, Colin Banks testified at the trial that his deposition testimony was a "mistake" and that the system offered for sale to Ricketson was not the same as his

invention. No credit will be given by the Court to Banks' trial testimony in this respect. The admissions made by him during his deposition are supported by other evidence in the case and will be given full credit by the Court.

For these reasons, the Court concludes that the patent in suit is invalid. Judgment will accordingly be entered in favor of defendants on Count I.

## V

### The Lanham Act Claim

■ In Count II of the complaint, plaintiff alleges that defendants violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by using invoice numbers, corporate marks and labels belonging to Waterfall in the operation of the business of Future Farms at the Craigs' greenhouse. This claim must likewise fail.

Section 1125(a) provides in pertinent part as follows:

(a)(1) Any person who, on or in connection with any goods or services, or any container of goods, used in commerce any word, term, name, symbol or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his other goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

When, after March 21, 1994, defendants undertook to operate the hydroponic farming business at the Craigs' greenhouse, they carefully distinguished between product belonging to Waterfall and that grown by Future Farms. When the Craigs took over possession of their greenhouse, some of the product was in the growing stage. To avoid waste, this perishable product, which had been grown during Waterfall's tenancy at will, was sold under generic labels, and defendants offered to remit the profits of such sales to plaintiff. This offer was refused. Product later grown at the greenhouse was sold under Future Farm labels. The evidence indicates that there was no passing off or reverse passing off either of the lettuce which was in the process of being grown when Waterfall was evicted from the greenhouse or of the lettuce which was later planted, grown and harvested after March 21, 1994.

Plaintiff argues that the same bar code used by Waterfall was later used by defendants when it sold its product and that such use was likely to cause confusion in the minds of consumers as to the source of the product. There is no merit to this contention. At no time after defendants took over the business and sold for Waterfall's account the product then being grown in March of 1994, has Waterfall produced any product which could be confused with that of Future Farms. Once it no longer occupied the greenhouse, Waterfall has neither grown nor sold any lettuce at all, nor has it attempted to do so. Indeed, after it was evicted from the Craigs' greenhouse, Waterfall did not have the means for or a facility for growing lettuce hydroponically. Moreover, the bar codes now being used by Future Farms are not identical with those used by Waterfall, and evidence does not exist indicating that a scanner would identify the product as that of plaintiff. In any event, the ordinary consumer does not make use of a bar code to determine the source of a product. The establishments which purchased lettuce from defendants knew where the product was coming from. There was accordingly no confusion of product.

Since plaintiff has not proven that the marks and labels employed by defendants caused confusion or mistake in the minds of consumers as to the source of the product, plaintiff is not entitled to recover damages

from defendants under Count II for a violation of the Lanham Act.

## VI

### The Claim of Tortious Interference With Contract

■ In Count VI of the complaint, plaintiff alleges that defendants have tortiously interfered with a contract of employment existing between Waterfall and Denise Mingo. From the facts produced at the trial, the Court concludes that the "Covenant Not to Compete" relied upon by plaintiff was not a valid, enforceable contract.

Mingo was initially hired by Peter Craig at a time when he was operating the business at the greenhouse. Beginning on September 1, 1993, after Peter had left, Mingo worked under the supervision of the Chapins. On September 28, 1993, she was presented with a document entitled "Covenant Not to Compete" (hereinafter the "Covenant") and was asked to sign it. However, little was said to her at the time concerning the import of that document. She was not told that her employment would be terminated if she did not sign nor was she given any other explanation as to reason for or the meaning of the document. Mingo has testified that she did not know what she was signing when the document was presented to her. The Craigs were not aware of the existence of the Covenant until March 19, 1994.

Mingo's employment was at will, and such employment relationship with Waterfall had been established before she was asked to sign the Covenant. Post-employment restraints are scrutinized with particular care because, as in this case, they are often the product of unequal bargaining power and the employee has given scant attention to the hardship suffered through loss of her livelihood. *Restatement (Second) of Contracts*, § 188, Comment g. Since no new consideration was extended to Mingo on September 28, 1993, the attempted restraint was under Virginia law unreasonable. *See PEMCO Corp. v. Rose*, 163 W.Va. 420, 257 S.E.2d 885 (1979) (applying Virginia law) 257 S.E.2d. Under the circumstances, the Covenant at issue here was unreasonably broad and can-

not provide the basis for a claim of tortious interference with contract. *See NCH Corp. v. Share Corp.*, 757 F.2d 1540, 1543 (5th Cir.1985). Moreover, plaintiff has not proved in this case that defendants employed methods which were improper by some measure other than the mere fact of interference. *See Vigoro Indus., Inc. v. Cleveland Chemical Co. of Arkansas, Inc.*, 866 F.Supp. 1150, 1167–68 (E.D.Ark.1994). When the alleged interference involves an employment contract terminable at will, the law recognizes a privilege to compete. *Id.* at 1166. In exercising this privilege, defendants employed no improper methods.

Under the circumstances, the Court concludes that plaintiff is not entitled to recover damages from defendants under Count VI of the complaint.

## VII

### The Claim of Conversion

Count VII of the complaint seeks a recovery from defendants under a theory of conversion. According to plaintiff, defendants converted to their own use money and property owned by Waterfall and used by Waterfall in the conduct of its business of growing and selling hydroponic products.

■ In support of its claim of conversion, plaintiff in its trial brief has relied on two Maryland cases, including *Baltimore & Ohio Railroad Company v. Equitable Bank*, 77 Md.App. 320, 550 A.2d 407 (1988). To prevail under Maryland law on a claim of conversion, a plaintiff must prove exercise by the defendant of unauthorized dominion and control over the property to the complete exclusion of the rightful possessor. *Yost v. Early*, 87 Md.App. 364, 388, 589 A.2d 1291 (1991), *cert. denied*, 324 Md. 123, 596 A.2d 628 (1991), *citing Citizens Nat. Bank v. Osetek*, 353 F.Supp. 958, 963 (S.D.N.Y.1973). Mere temporary interference with property rights is not sufficient. *Id.*

■ In this particular case, defendants converted neither money nor property belonging to Waterfall. The $1,115 withdrawn by Carol Craig from the Waterfall bank account at a time when she was still an officer

of the Corporation was used to pay the expenses and salary which were owed to Mingo during the latter period of time when she was working for the Corporation. Wages owed to other employees were also paid from this sum. No money of Waterfall was used by Future Farms for its own purposes. The nutrient, crispers and boxes located on the premises on March 21, 1994 were used to complete the growth and sale for Waterfall's benefit of the lettuce in process, and the profits of such sales were offered to Waterfall and refused by it. Moreover, the Craigs offered to return to Waterfall its personal property which had remained on the greenhouse premises after March 21, 1994, including its trailer. This offer was refused, it being Waterfall's position that a lease existed and that its personal property should remain in place. Accordingly, any interference with Waterfall's property rights caused by its eviction was merely temporary. Under these circumstances, Waterfall cannot successfully contend that its property was converted by the defendants.

For these reasons, judgment will be entered in favor of defendants on Count VII of the complaint.

### VIII

*Claim of Breach of Fiduciary Duty*

■ In Count VIII of the complaint, plaintiff alleges that the Craigs owed plaintiff a duty of loyal and fair dealing as officers and directors of the Corporation and that their attempt to take over plaintiff's business constituted a breach of that fiduciary duty. There is likewise no merit to this claim of plaintiff.

The Court of Appeals of Maryland has not as yet recognized the tort of breach of fiduciary duty nor has that Court opined concerning the elements or rules of damages for such a tort. *Adams v. Coates,* 331 Md. 1, 12, 626 A.2d 36 (1993). Several decisions of the Court of Special Appeals of Maryland have recognized the existence of that tort under Maryland law. For example, it has been held that general partners owe limited partners a fiduciary duty and cannot take advantage of a business opportunity involving their property where the opportunity should belong to the partnership. *Dixon v. Trinity Joint Venture,* 49 Md.App. 379, 431 A.2d 1364 (1981).

Maryland law recognizes that an officer and director of a corporation occupies a fiduciary relationship as regards the corporation. *Merchants Mortgage Co. v. Lubow,* 275 Md. 208, 215, 339 A.2d 664 (1975); *Crawford v. Mindel,* 57 Md.App. 111, 120, 469 A.2d 454 (1984). However, the mere fact that the Craigs were officers and directors of Waterfall did not impose on them a legal obligation to accede to demands of the Corporation which were adverse to their personal financial interests.

The Craigs were not only minority stockholders, directors and officers of Waterfall but they also occupied the position of putative lessors of the greenhouse. In the latter capacity, their interests were adverse to those of the Corporation, and they had every right to take proper and lawful steps to protect the substantial investment which they had in the real property owned by them. The Craigs were the owners of the valuable greenhouse property and the equipment installed therein. In the absence of a valid and binding lease, the Craigs had the right to resume full possession of their property when serious disputes arose between the parties and when two separate suits had been instituted against them. Moreover, since the Banks' method patent was invalid for the reasons discussed herein, the Craigs had the further right to operate on their property the business of growing and selling hydroponic products. Under all these circumstances, there was no unfairness nor any breach of fiduciary duty by the Craigs when they undertook to operate the hydroponic business for their own account after Waterfall's tenancy at will was terminated. There was no unfair competition inasmuch as Waterfall was no longer in a position to compete in the absence of any right to occupy the greenhouse as a lessee.

Accordingly, plaintiff's claim of breach of fiduciary duty asserted in Count VIII of the complaint must likewise fail.

## IX

### *Conclusion*

For all the reasons stated, plaintiff is not entitled in this case to recover any damages [13] from defendants nor is it entitled to any of the other relief sought. In the absence of a written lease, the Craigs had the right, on March 21, 1994, to evict Waterfall from their greenhouse property. Since the Banks' patent was invalid, the Craigs had the further right to conduct on their premises the business of growing and selling hydroponic products. No breach of contract has been proved, nor has plaintiff proven that defendants engaged in any sort of tortious conduct. Judgment will accordingly be entered in favor of the defendants on all counts, with costs. An appropriate Order will be entered by the Court.

---

13. Defendants have challenged as speculative plaintiff's claim for damages for lost future profits. Since the Court has determined that defendants are not liable to plaintiff under any of the counts of the complaint, it is not necessary to address the issue of damages in this case.